# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

|                                    |   |                           |
|------------------------------------|---|---------------------------|
|                                    | * |                           |
| **MONTGOMERY COUNTY,**             |   |                           |
| **MARYLAND,** *et al.*,            | * |                           |
|                                    |   |                           |
| **Plaintiffs,**                    | * |                           |
|                                    |   | **Case No.: PWG-18-3575** |
| **v.**                             | * |                           |
|                                    |   |                           |
| **BANK OF AMERICA CORP.,** *et al.*, | * |                         |
|                                    |   |                           |
| **Defendants.**                    | * |                           |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

On November 20, 2018, Plaintiffs Montgomery County, Maryland and Prince George's County, Maryland (the "Counties") filed two lawsuits in this Court pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*: one before Judge Messitte, *Prince George's County v. Wells Fargo & Co.*, No. PJM-18-3576 (the "Wells Fargo case"), and the one that is pending before me, Compl., ECF No. 1. In the Wells Fargo case, the Counties brought claims for disparate impact and disparate treatment against Wells Fargo & Co. and related entities ("Wells Fargo"), alleging that the defendants "engaged in predatory lending practices relative to FHA-protected minority communities"; they claimed that the defendants' practices amounted to an "'equity-stripping' scheme"[1] that "contributed to the recent financial crisis characterized by mortgage loan delinquencies, mortgage loan defaults, foreclosures, and home vacancies across the country and

---

[1] "[E]quity stripping relies primarily on charging borrowers higher fees at all stages of a loan's life cycle, and then preventing borrowers from getting out from underneath these onerous loan terms by denying their modification requests." *County of Cook, Ill. v. Wells Fargo & Co.* ("*Cook (Wells Fargo)*"), 314 F. Supp. 3d 975, 993 (2018).

more specifically in Plaintiff Counties, particularly in communities with high concentrations of FHA-protected minority residents." *Prince George's County v. Wells Fargo & Co.* ("*Wells Fargo*"), No. PJM, 18-3576, --- F. Supp. 3d ----, 2019 WL 3766526, at *1 (D. Md. Aug. 9, 2019). The first disparate impact claim arises from the effects of the "equity-stripping" scheme throughout the life of the loan, "beginning with loan origination and continuing through servicing and mortgage foreclosure," while the second is "based solely on Wells Fargo's mortgage servicing and foreclosure practices." *Id.* The third count is for "intentional disparate treatment throughout the entire equity-stripping scheme." *Id.*

Here, the defendants are different, but the claims are the same. Defendants are Bank of America Corp.; Bank of America, N.A.; and BAC Home Loans Servicing, LP (collectively, "Bank of America"); Countrywide Financial Corp.; Countrywide Home Loans, Inc.; Countrywide Bank, FSB; and Countrywide Warehouse Lending, LLC (collectively, "Countrywide"); and Merrill Lynch & Co.; Merrill Lynch Mortgage Capital, Inc.; and Merrill Lynch Mortgage Lending Inc. (collectively, "Merrill" and, along with Bank of America and Countrywide, the "Banks"). Compl. "The Complaint alleges that Defendants are engaging in a nationwide equity stripping scheme involving a pattern and practice of discrimination that begins with steering minorities into non-prime loans, continues through servicing, and ends with foreclosure or vacancy." Pls.' Opp'n 2; *see id.* at 3 (citing Compl. ¶¶ 4, 6-8, 92-93, 140-41, 187-96, 329-34, 345-48, 361-64); Defs.' Mem. 1. As in the Wells Fargo case, the Counties claim disparate impact on minorities based on the Banks' loan origination, mortgage servicing, and foreclosure practices; disparate impact on minorities based on the Banks' mortgage servicing and foreclosure practices alone; and intentional disparate treatment of minorities based on the entirety of the alleged equity-stripping scheme. Compl. ¶¶ 125, 133, 137. In both cases, "[t]he Counties sue as individual aggrieved persons under

42 U.S.C. § 3602(i), not in their *parens patriae* capacities." *Wells Fargo*, 2019 WL 3766526, at *1; Compl. ¶¶ 16–17.

Wells Fargo and the Defendants in the case before me both filed motions to dismiss. Defs.' Mot., ECF No. 48; ECF No. 24 in *Wells Fargo*. Wells Fargo argued, *inter alia*, that the Counties' claims were untimely, failed to state a claim, and the Counties could not "meet the rigorous requirement of pleading direct proximate cause recognized by the United States Supreme Court on a review of FHA allegations parallel to those made by the Counties in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)," because the alleged injures "are too remote to satisfy the 'close connection that proximate cause requires.'" *Wells Fargo* Mot. 1–2. The Banks raise the same arguments. Defs.' Mot. 2.

Recently, Judge Messitte issued a well-reasoned Memorandum Opinion in which he rejected both the statute of limitations argument and also Wells Fargo's argument that the Counties failed to allege disparate impact or disparate treatment sufficiently. *Wells Fargo*, 2019 WL 3766526, at *9, *10. He concluded that "the 'some direct relation' standard" from *City of Miami*, 137 S. Ct. at 1306, was "well pled in regard to [a subset of the] claimed injuries": the expenses the Counties incurred "processing foreclosures occasioned by Defendants' purported violations, including costs for foreclosure notices, court proceedings, Sheriffs' auctions, Sheriffs' evictions, and registration, monitoring, and maintenance of empty properties." *Wells Fargo*, 2019 WL 3766526, at *5. As for "damages based on the cost of having to provide municipal services on foreclosed properties, such as fire and police, as well as social services that were needed to assist evicted or foreclosed borrowers"; "tax base injuries"; and "lost revenue from certain utility operations and lost recording fees," Judge Messitte found that they were "further removed from Defendants' alleged equity-stripping practices than are the costs associated with processing

foreclosures" and "allow[ed] the Counties time to amend their complaint to include more detail in respect of the claims, if indeed they are able to do so"; he also noted that limited discovery on these issues prior to amendment may be warranted. *Id.* at *6, *7–8. The claims for non-economic damages, however, Judge Messitte concluded were "a bridge too far," and he dismissed them, while allowing the Counties' claims for "injunctive and declaratory relief against Defendants' alleged equity-stripping practices" to proceed. *Id.* at *9.

The Banks' Motion to Dismiss is fully briefed and pending. *See* ECF Nos. 48-1, 50, 51; *see also* Pls.' Notice of Supp. Auth., ECF No. 53 (attaching copy of *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019), ECF No. 53-1); Defs.' Resp., ECF No. 54. A hearing is not necessary. *See* Loc. R. 105.6. Informed by this Court's opinion in *Wells Fargo*, 2019 WL 3766526, the Supreme Court's and Eleventh Circuit's opinions in *City of Miami*, 127 S. Ct. 1296, and *City of Miami*, 923 F.3d 1260, and opinions from other courts in similar FHA litigation against banks that allegedly engaged in the same type of equity-stripping schemes that injured the municipal plaintiffs, and considering the allegations in the 170-page, 560-paragraph Complaint before me, I will deny the motion as to some of the Counties' claims, grant it as to the remainder of the claims, and allow the Counties to file an amended complaint to bolster their allegations in their insufficiently pled claims, insofar as they have a good faith basis for doing so.

## Background[2]

The FHA, which has a "broad remedial purpose" is a "'far-reaching' statute that 'takes aim at discrimination that might be found throughout the real estate market and throughout the process of buying, maintaining, or selling a home.'" *Wells Fargo*, 2019 WL 3766526, at *3 (quoting *City*

---

[2] On Defendants' Motion to Dismiss, I accept Plaintiffs' well-pleaded allegations as true. *Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011).

*of Miami*, 923 F.3d at 1278, 1279). Pursuant to the Fair Housing Act, it is unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). Any "'aggrieved person,'" that is, "'any person who . . . claims to have been injured by a discriminatory housing practice,'" may "file a civil action seeking damages for a violation of the statute." *City of Miami*, 137 S. Ct. at 1300 (quoting 42 U.S.C. §§ 3602(i), 3613(a)(1)(A), (c)(1)).

The Counties claim that the Banks engaged in "residential mortgage lending and servicing activities" that amounted to "intentional, predatory," and discriminatory "equity-stripping schemes." Compl. ¶¶ 3–4. The equity-stripping scheme included "targeted marketing practices, discretionary pricing policies, credit score override practices, underwriting policies, wholesale mortgage funding and mortgage securitization operations, compensation policies and mortgage servicing operations" that "each individually, or in combination with each other, authorized, approved, or otherwise encouraged the origination and funding of first and second lien residential mortgage loans with different terms and conditions to similarly financially situated borrowers on the improper basis of race, color, ethnicity, sex and age." *Id.* ¶ 6. Specifically,

> Defendants' various mortgage origination, securitization and servicing policies and practices allowed or encouraged: (a) unchecked or improper credit approval decisions for minority borrowers, resulting in borrowers being approved for and receiving refinance and home equity loans they could not afford and consequently were likely to become delinquent and/or default on; (b) subjective surcharges on minority borrowers of additional points, fees and other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans; (c) minority borrowers to be steered into higher cost loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and (d) undisclosed inflation of appraisal values of minority residences in order to support inflated loan

amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

*Id.* ¶ 7.

The schemes caused "- and will continue to cause - unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies in Plaintiffs' communities and neighborhoods, particularly those communities with high percentages of FHA protected minority residents." Compl. ¶ 3. Costs that the Banks imposed as part of the scheme include "a wide range of income generating fees" for failure to make mortgage payments, "including late payment fees, insufficient funds fees, property inspection fees, broker price opinions, property preservation fees (e.g., taking photos), foreclosure fees, force placed insurance and documentation fees, etc." *Id.* ¶ 4.

According to the Counties, "Defendants' entire subprime and higher cost mortgage lending, securitization and servicing operations were geared to exploit borrowers, particularly FHA protected homeowner-borrowers, in order to maximize their corporate profits and their management's compensation." *Id.* ¶ 5. They claim that the Banks "identif[ied] and target[ed] FHA protected minority borrowers using advanced data mining techniques and predictive analysis methodologies." *Id.* ¶ 7. The effect was that "Plaintiffs' communities and neighborhoods with relatively higher concentrations of FHA protected African American and Latino/Hispanic minority homeowners have disproportionately and disparately received more of such higher cost mortgage loans and have been disproportionately and disparately impacted by the increased delinquencies, defaults, foreclosures and home vacancies resulting from such loans." *Id.* ¶ 8.

As noted, the Counties are not however, suing in *parens patriae*; they bring their claims as aggrieved persons, alleging that the Counties themselves were injured (and will continue to be injured) by the Banks' equity-stripping scheme. *See* Compl. ¶ 9; 42 U.S.C. § 3602(i). They claim:

Defendants' discriminatory mortgage servicing and foreclosure activities have directly caused tremendous tangible monetary damage to Plaintiffs including, but not limited to: (i) out-of-pocket costs for required eviction and foreclosure notices, judicial and non-judicial foreclosure-related processes; (ii) registration and monitoring of foreclosed properties; (iii) inspecting, securing, cleaning, maintaining and/or demolishing abandoned or vacant properties; (iv) additional municipal police and fire services on specific vacant or foreclosed properties for which Defendants are responsible, as well as other services to the evicted or foreclosed homeowners of such properties; (v) the loss of various property tax and concession income on specific vacant or foreclosed properties for which Defendants are responsible; and (vi) for the loss of certain property recording and transfer fee income on such properties, all of which is directly tied to the defaulted nonprime mortgage loans that Defendants originated, funded and/or serviced. In addition, Plaintiffs have been damaged as a result of the necessary reallocation of their limited resources, as well as to their missions to provide fair and affordable housing and prevent urban blight. Plaintiffs believe that they will continue to be injured by Defendants' discriminatory housing practices that are about to occur, particularly the continuing home vacancies and foreclosures occurring in higher concentrated minority areas.

Compl. ¶ 9.

## **Standard of Review**

Pursuant to Rule 12(b)(6), a plaintiff's claims are subject to dismissal if they "fail[ ] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6)'s purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012) (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).

Generally, a Rule 12(b)(6) motion to dismiss does not "permit an analysis of potential defenses a defendant may have to the asserted claims." *J&J Sports Prods., Inc. v. Pro Street Shop, LLC, t/a Pro St. Cafe*, No. DKC 18-1000, 2019 WL 3290161, at \*2 (D. Md. July 22, 2019). Nonetheless,

> dismissal may be appropriate when a meritorious affirmative defense is clear from the face of the complaint. *Brooks v. City of Winston–Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 250 (4th Cir. 1993)). "The statute of limitations is an affirmative defense that should only be employed to dismiss claims pursuant to Rule 12(b)(6) when it is clear from the face of the complaint that the claims are time barred." *Long v. Welch & Rushe, Inc.*, 28 F.Supp.3d 446, 456 (D. Md. 2014) (citations omitted); *see also* 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357, at 352 (3d ed. 2019) ("A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading[,]" rendering dismissal appropriate).

*Id.*

A court's evaluation of a Rule 12(b)(6) motion is "generally limited to a review of the allegations in the complaint itself," though a court also may consider "documents that are explicitly incorporated into the complaint by reference," those "attached to the complaint as exhibits," and documents that are considered "integral to the complaint," provided there is no dispute about the document's authenticity. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). The Banks attached a Memorandum from the Montgomery County Attorney to the President of Montgomery County Council, ECF No. 48-3; a Fall 2004 "District 5 Report from Tom Perez," ECF No. 48-4; and a June 2012 "Analysis of Impediments to Fair Housing Choice, ECF No. 48-5, to their Motion to Dismiss. ECF Nos. 48-3 – 48-5. These documents are not integral to the Complaint. Accordingly, I will not consider them in deciding this motion. *See Goines*, 822 F.3d at 165–66.

## Statute of Limitations

A two-year statute of limitations applies to FHA claims. 42 U.S.C. § 3613 (a)(1)(A). Specifically,

> [a]n aggrieved person may commence a civil action . . . not later than 2 years after the occurrence *or the termination* of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

*Id.* (emphasis added).

The Banks argue that, "[o]n its face, the Complaint plainly runs afoul of this deadline" because "[i]t does not identify a single specific loan that was made or foreclosure that occurred within the two-year limitations period" and it does not "assert any type of statistical analysis of conduct within the window that reflects discriminatory loans, servicing, or foreclosures." Defs.' Mem. 27. Noting that "a '"continuing violation" of the Fair Housing Act should be treated differently from one discrete act of discrimination,'" the Counties counter that "the two-year limitations period ***has not even commenced***" because they alleged "an ongoing discriminatory equity stripping practice" that has not yet terminated. Pls.' Opp'n 13 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982)).

"[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982); *see County of Cook v. HSBC N. Am. Holdings Inc.* ("*Cook (HSBC) II*"), 314 F. Supp. 3d 950, 969 (N.D. Ill. 2018) (quoting *Havens*); *Nat'l Fair Hous. Alliance v. HHHunt Corp.*, 919 F. Supp. 2d 712, 715 n.1 (W.D. Va. 2013) ("The words 'or the termination' were added [to 42 U.S.C. § 3613 (a)(1)(A)] by

Congress in 19[8]8, and several courts have noted that the amendment was intended to clarify Congress's intent to allow parties to recover for earlier acts under the FHA that constitute part of an ongoing pattern or practice."); *County of Cook v. Bank of Am. Corp.* ("*Cook (Bank of Am.) I*"), 181 F. Supp. 3d 513, 520 (2015) (noting that Congress added the words "or the termination" to "codify the continuing violation doctrine recognized in *Havens*). "[T]here must be some type of relationship or connection between the acts that occurred within the limitations period and those that occurred before that time." *HHHunt Corp.*, 919 F. Supp. 2d at 716. In *Cook (HSBC) II*, the court held that "adjudication of HSBC's statute of limitations defense must await summary judgment" because "each of the County's counts include[d] plausible allegations that HSBC continue[d] to service and foreclose on loans in a discriminatory manner." 314 F. Supp. 3d at 969 (citing, e.g., *City of Los Angeles v. Citigroup Inc.*, 24 F. Supp. 3d 940, 951–52 (2014) (concluding on a motion to dismiss that allegations similar to the *Cook (HSBC) II* plaintiffs' claims were timely under the continuing violations doctrine)).

In *County of Cook, Illinois v. Wells Fargo & Co.* ("*Cook (Wells Fargo)*"), "the complaint clearly allege[d] that Wells Fargo continue[d] to the present day to implement its equity-stripping practice," such as by "still making decisions 'whether or not to modify a defaulted or high cost loan at the borrower's request and whether to foreclose on a particular defaulted borrower's home,'" decisions that were "part and parcel of Wells Fargo's equity-stripping practice." 314 F. Supp. 3d 975, 995–96 (2018). The court observed that "equity stripping by its 'very nature involves repeated conduct." *Id.* at 996 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). On these bases, the court concluded that "the complaint plausibly pleads that the practice has not yet terminated, *see* 42 U.S.C. § 3613(a)(1)(A), thus rendering timely the County's claims." *Id.*

Here, the Counties claim that all of the allegedly discriminatory acts are part of a comprehensive equity-stripping scheme that spans the life of the loans, continuing until the inevitable foreclosure. Compl. ¶¶ 3–9, 59, 334, 434, 452. Thus, they have alleged "an unlawful practice" rather than discrete incidents. *See Havens*, 455 U.S. at 380–81. And, they allege that the Banks continue to service some of these predatory loans, and that some loans have not yet, but will, result in foreclosure. Compl. ¶¶ 9, 59, 434, 459, 559. Therefore, the ongoing acts relate to the acts that occurred outside the limitations period, as they relate to loans that previously were made as part of the challenged scheme, such that the Banks have alleged a continuing violation.[3] *See HHHunt Corp.*, 919 F. Supp. 2d at 716.

The Banks insist that, even if the Counties alleged a continuing violation, they had "notice of [their] claims prior to the limitations period," and that notice "prevents application of the continuing violation doctrine." Defs.' Mem. 27–28 (citing *Ocean Acres Ltd. P'ship v. Dare Cty. Bd. of Health*, 707 F.2d 103, 107 (4th Cir. 1983)). In this regard, they rely on documents, such as a memorandum from the Montgomery County Attorney to the President of the Montgomery County Council, to establish notice. But, as noted, these exhibits are not properly before me on a motion to dismiss. *See Goines*, 822 F.3d at 165–66. Moreover, as also noted, the defense of statute

---

[3] Because the Counties allege a continuing violation, for which the alleged conduct by each Defendant all forms part of a policy that violates the FHA, the Banks' motion to dismiss the claims against Countrywide and Merrill, on the grounds that these Defendants were no longer a part of the allegedly unlawful practice in the two years prior to when the Counties filed suit, is unavailing. *See HHHunt Corp.*, 919 F. Supp. 2d at 715 n.1 (noting that "parties [may] recover for earlier acts under the FHA that constitute part of an ongoing pattern or practice"); *Dekalb Cty. v. HSBC N. Am. Holdings Inc.*, No. 12-CV-3640-ELR, 2015 WL 8699229, at *8 (N.D. Ga. Nov. 16, 2015) ("[A] proper party includes any Defendant who has contributed in any way to the scheme, such as via 'establishing, disseminating, monitoring, enacting and/or enforcing [Defendants'] corporate policies and practices that permitted or encouraged the discriminatory conduct.'").

of limitations must be "clear from the face of the complaint," not shown through exhibits, to be considered on a motion to dismiss. *See Brooks v. City of Winston–Salem*, 85 F.3d 178, 181 (4th Cir. 1996); *J&J Sports Prods.*, 2019 WL 3290161, at \*2; *see also Wells Fargo*, 2019 WL 3766526, at \*9 ("When a court is ruling on a Motion to Dismiss pursuant to Rule 12(b)(6), it generally may not consider extrinsic evidence, *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011), although it may take judicial notice of matters of public record. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).").

In any event, this Court has rejected this argument previously, as has the Northern District of Illinois. *See Wells Fargo*, 2019 WL 3766526, at \*9 (noting Wells Fargo's argument in favor of dismissal that, "based on certain communications sent, for instance, by the Montgomery County Attorney to the Montgomery County Council, the Counties had actual knowledge of their purportedly actionable injuries more than three years before the present suit was filed, which is to say, out of time" and concluding that the Court could not "resolve this issue at this early stage of the proceedings"); *Cook (Bank of Am.) I*, 181 F. Supp. 3d at 521 ("I cannot determine on the basis of the complaint whether the County knew or should have known between 2004 and 2008 that 95,000 home loans signed by minority borrowers contained discriminatory terms and conditions. In support of their statute of limitations argument, Defendants ask me to consider documents that are beyond the scope of a motion to dismiss."); *see also Cook (Wells Fargo)*, 314 F. Supp. 3d at 996 ("At minimum, because it is not apparent from the pleadings when Cook County 'knew or should have known' that the equity-stripping practice constituted an actionable cumulative violation under the FHA, the motion to dismiss on the ground that the FHA's two-year statute of limitations has run is premature.").

In *Wells Fargo*, Judge Messitte reasoned:

> [T]he existence of internal memos by and between County officials, particularly without more context, does not by itself dispose of the Counties' claims. The type of fact-weighing Defendants ask the Court to engage in is well beyond the bounds of a Motion to Dismiss, which tests only the sufficiency of the Complaint. Defendants' limitations argument is more appropriately raised on a motion for summary judgment.

2019 WL 3766526, at *10. I agree. Accordingly, the Counties sufficiently alleged a timely continuing violation to survive Defendants' motion to dismiss based on the statute of limitations. *See id.*; *Cook (HSBC) II*, 314 F. Supp. 3d at 969. Whether the violations are indeed ongoing and whether the Counties had notice that would serve as an impediment to their claims may be raised on summary judgment.

## Pleading Disparate Impact and Disparate Treatment

The FHA prohibits "any person or other entity whose business includes engaging in residential real estate transactions" from "discriminat[ing] against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). "A plaintiff 'may establish discrimination in violation of the FHA[] under a theory of disparate treatment or disparate impact.'" *In re Council of Unit Owners of 100 Harborview Drive Condo.*, 580 B.R. 135, 150 (Bankr. D. Md. 2018) (quoting *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008)).

To state a claim for disparate impact in violation of the FHA, "a plaintiff must allege not only a statistical disparity, but also that the defendant maintained a specific policy that caused the disparity." *Cook (Wells Fargo)*, 314 F. Supp. 3d at 990 (citing *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, ⸺ U.S. ⸺, 135 S. Ct. 2507, 2523–24 (2015)). Additionally, "the challenged policy must be 'artificial, arbitrary, and unnecessary." *Id.* at 991. And, the plaintiff must allege "a robust causal connection between the challenged policy (or

13

policies) and the disparate impact." *See Wells Fargo*, 2019 WL 3766526, at *10 (citing *Inclusive Communities*, 135 S. Ct. at 2523–24; *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415 (4th Cir. 2018)).[4]

To state a claim for disparate treatment under the FHA, the Counties must allege that "similarly situated persons or groups are subject to differential treatment," *Potomac Grp. Home Corp. v. Montgomery Cty., Md.*, 823 F. Supp. 1285, 1295 (D. Md. 1993) (quoting *Stewart B. McKinney Found. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1211 (D. Conn. 1992)), and that "the defendant had a discriminatory intent or motive." *OT, LLC v. Harford Cty., Maryland*, No. GLR-17-2812, 2019 WL 4598009, at *12 (D. Md. Sept. 23, 2019) (quoting *Clark v. 100 Harborview Drive Council of Unit Owners*, No. JFM-14-3122, 2016 WL 1159198, at *4 (D. Md. Mar. 23, 2016) (quoting *Inclusive Communities*, 135 S. Ct. at 2513)); *Cook (HSBC) II*, 314 F. Supp. 3d at 966 (stating that the discrimination must be intentional). "Several district courts have found that evidence of targeting and/or reverse redlining,[5] such as alleged here,

---

[4] A "three-step burden-shifting framework" applies to FHA disparate impact claims, but only the first step is relevant on a motion to dismiss. The three steps are as follows:

> First, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact. Second, the defendant has the burden of persuasion to explain the valid interests served by their policies. Third, the plaintiff must prove that the defendant's asserted interests "could be served by another practice that has a less discriminatory effect."

*Wells Fargo*, 2019 WL 3766526, at *10. (quoting *Reyes*, 903 F.3d at 424 (quoting *Inclusive Communities*, 135 S. Ct. at 2515, 2522-23).

[5] To "redline" is "to withhold home-loan funds or insurance from neighborhoods considered poor economic risks" or "to discriminate against in housing or insurance." Redline, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/redline#legalDictionary. "Redlined" areas on maps graded by government surveyors "were the ones local lenders discounted as credit risks, in large part because of the residents' racial and ethnic demographics." Tracy Jan, *Redlining was banned 50 years ago. It's still hurting minorities today.* (Wash. Post Mar. 28, 2018). Reverse redlining is "the illegal practice of extending credit on unfair terms in a particular community on a discriminatory basis (as because of the race or ethnicity of its residents." Reverse relining,

may establish discriminatory intent in housing discrimination cases." *Wells Fargo*, 2019 WL 3766526, at *10 (citing *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857, 2011 WL 1706756, at *14 n.56 (W.D. Tenn. 2011) (collecting cases); *County of Cook v. HSBC N. Am. Holdings, Inc.* ("*Cook (HSBC) I*"), 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015)).

Notably, a plaintiff may proceed on both the disparate impact and disparate treatment claims as alternative theories of recovery. *See* Fed. R. Civ. P. 8(d)(2); *Wells Fargo*, 2019 WL 3766526, at *10; *see also Reyes*, 903 F.3d at 421; *Cook (Wells Fargo)*, 314 F. Supp. 3d at 994 ("It is true that Cook County also alleges that Wells Fargo intentionally targeted minority borrowers. But Civil Rule 8(e) allows plaintiffs to plead alternative theories, provided that they 'use a formulation from which it can be reasonably inferred that this is what they were doing.'") (quoting *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000)). Also, "although a plaintiff is not required to explicitly allege, or, ultimately, to prove intent as part of a disparate-impact theory, a plaintiff is not precluded from doing so," and "evidence of discriminatory intent" that is not enough to plead disparate treatment may support a disparate impact claim. *Cook (HSBC) II*, 314 F. Supp. 3d at 968.

### Policy and Statistical Disparity

In *County of Cook v. Bank of America Corp.* ("*Cook (Bank of Am.) II*"), where the plaintiff "undeniably articulate[d] a multifaceted 'equity-stripping scheme,'" the court noted that there was no authority before it "to suggest that the 'specific' practice challenged in a disparate-impact claim must be limited to a single component." No. 14-C-2280, 2018 WL 1561725, at *9 (11th Cir. Mar.

---

Merriam-Webster Dictionary, www.merriam-webster.com/legal/reverse redlining; *see* Compl. ¶ 320 (defining reverse redlining as "the intentional targeting of FHA protected minorities for the extension of credit on unfavorable terms").

30, 2018). It accepted the equity-stripping scheme as the "policy" element of the plaintiff's disparate impact claim, observing that "[o]ver the course of more than five hundred painstakingly detailed paragraphs, the County describe[d] the various components of the challenged equity stripping scheme and explaine[d] how those components, and the scheme as a whole, . . . had a disproportionately negative impact on minority borrowers and . . . injured the County as a result." *Id.*

In *Wells Fargo*, the defendants argued "(a) that the Counties do not point to a specific policy to challenge, but rather lump together broad categories of Defendants' mortgage operations and challenge them all, and (b) that the Counties' statistics do not demonstrate disparate impact." 2019 WL 3766526, at *10. The Court disagreed, observing:

> [T]he Counties unquestionably do challenge a specific policy or policies of Defendants, viz., equity stripping, which the Counties describe as a "pattern and practice of discrimination that begins with steering minorities into non-prime loans, continues through servicing, and ends with foreclosure or vacancy." ECF No. 38 at 4. Other courts have clearly held that equity-stripping is a specific policy challengable under the *Inclusive Communities* framework. *See County of Cook v. Bank of America Corporation*, No. 14 c 2280, 2018 WL 1561725 at *9 (N.D. Ill., March 30, 2018); *County of Cook, Illinois v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 992 (N.D. Ill. 2018). Even considered as discrete practices, the Counties have identified several practices, which is to say policies, within the processes of loan origination, servicing, and foreclosure that are challengable. *See County of Cook v. HSBC North America Holdings Inc.*, 314 F. Supp. 3d 950, 967 (N.D. Ill. 2018) (accepting the morass of policies identified by Cook County as sufficient under *Inclusive Communities*, pointing to allegations about "mortgage lending and services policies; pricing and marketing policies; various underwriting policies; loan servicing and loss mitigation policies; and foreclosure-related policies.").

*Id.*; *see also Cook (Bank of Am.) I*, 181 F. Supp. 3d at 522–23 ("The County has, in fact, alleged a variety of practices that allegedly had a disparate impact on minority borrowers. *See* Compl. at ¶ 7–8 (alleging that Defendants' discretionary pricing policies, credit approval decisions, and appraisal practices resulted in minority borrowers receiving a disproportionate share of high cost home loans).").

Likewise, in *Cook (Wells Fargo)*, the court concluded that "Cook County's FHA disparate impact claim surmount[ed] the plausibility hurdle." 314 F. Supp. 3d at 992. It reasoned that "the County identifie[d] a set of related statistical disparities, alleging that Wells Fargo issued a disproportionate number of high-cost, subprime, or other nonprime loans to minority borrowers in Cook County" and also "identifie[d] a policy—Wells Fargo's equity-stripping practice—to which it attribute[d] the alleged statistical disparity." *Id.* ("Specifically, the County allege[d] that equity stripping was a considered, long-term effort to 'maximize[] lender profits . . . in disregard for a borrower's ability to repay' through 'interrelated predatory and discriminatory loan making, loan servicing and foreclosure activities that occur over the entire life of each mortgage loan."). Moreover, "Wells Fargo's equity-stripping practice ha[d] the requisite causal connection to the statistical disparity," as "Cook County allege[d] that key aspects of the practice, including Wells Fargo's refusal to grant loan modification requests made by distressed borrowers, pushed borrowers into foreclosure in a manner resulting in statistical disparities." *Id.* at 994. Thus, according to the pleading, "minority borrowers were disproportionately more likely, given their baseline rates of homeownership, to be subject to equity stripping than nonminority borrowers." *Id.*; *see also Cook (HSBC) II*, 314 F. Supp. 3d at 967 (concluding that plaintiff stated a disparate impact claim where the complaint was "replete with examples of HSBC policies that, according to the County, resulted in a disparate impact on minority borrower," such as "HSBC's mortgage lending and services policies; pricing and marketing policies; various underwriting policies; loan servicing and loss mitigation policies; and foreclosure-related policies").

Here, the Counties allege a "pattern and practice of predatory and discriminatory mortgage origination (pricing, underwriting and compensation) and servicing (payment acceptance, loan modification, and foreclosure)." Compl. ¶ 420. Their robust Complaint, like the complaints in

similar litigation brought against other banks and/or by different counties, e.g., *Wells Fargo* Compl.; *Cook (Bank of Am.) II*, 2018 WL 1561725, at *9, describes in detail "Defendants' targeted marketing practices, discretionary pricing policies, credit score override practices, underwriting policies, wholesale mortgage funding and mortgage securitization operations, compensation policies and mortgage servicing operations," which they claim "each individually, or in combination with each other, authorized, approved, or otherwise encouraged the origination and funding of first and second lien residential mortgage loans with different terms and conditions to similarly financially situated borrowers on the improper basis of race, color, ethnicity, sex and age," *id.* ¶ 6, and "inevitabl[y] result[ed]" in "[i]ncreased vacancies and foreclosures," *id.* ¶ 4. Based on the case law discussed above, the Counties can challenge these policies individually or collectively as an equity-stripping practice. *Wells Fargo*, 2019 WL 3766526, at *10; *Cook (Wells Fargo)*, 341 F. Supp. 3d at 992; *Cook (HSBC) II*, 314 F. Supp. 3d at 967; *Cook (Bank of Am.) I*, 181 F. Supp. 3d at 522–23.

The Counties also allege that the Banks' "predatory loan origination (pricing, underwriting and compensation) and servicing (payment acceptance, loan modification, and foreclosure) policies and practices were artificial, arbitrary, and unnecessary." Compl. ¶ 421. According to Plaintiffs, the policies of increasing costs and fees "were not necessary to compensate for additional risk" and they "permitted pricing on mortgage loans originated to FHA protected minority borrowers on a subjective basis without regard to objective factors." *Id.* Further, "Defendants' incentive policies provided financial incentive for Defendants' employees and independent brokers to exercise the discretionary pricing policy in a subjective manner, without regard to objective factors." *Id.* These allegations sufficiently allege a policy for purposes of a disparate impact claim. *See Cook (Wells Fargo)*, 314 F. Supp. 3d at 991

And, as in *Cook (Wells Fargo)*, the Counties "identifie[d] a set of related statistical disparities" to show that the Banks "issued a disproportionate number of high-cost, subprime, or other nonprime loans to minority borrowers in [the Counties]." 314 F. Supp. 3d at 992; Compl. ¶¶ 326–33. Thus, the Counties sufficiently alleged both a statistical disparity and a specific policy that is "artificial, arbitrary, and unnecessary" to state a disparate impact claim. *See Inclusive Communities*, 135 S. Ct. at 2523–24; *Cook (Wells Fargo)*, 314 F. Supp. 3d at 990–91. And, through these allegations, they have claimed that "similarly situated persons or groups are subject to differential treatment," to state a disparate treatment claim. *See Potomac Grp. Home Corp.*, 823 F. Supp. at 1295. Further, they allege that the Banks engaged in "discriminatory targeting and discriminatory treatment of FHA protected minority borrowers relating to Defendants' predatory mortgage lending activities, including the discriminatory housing practice of 'reverse redlining,'" which is "the intentional targeting of FHA protected minorities for the extension of credit on unfavorable terms," such that they acted with discriminatory intent, as required for a disparate treatment claim. Compl. ¶ 320; *see Inclusive Communities*, 135 S. Ct. at 2513; *OT, LLC*, 2019 WL 4598009, at *12; *Wells Fargo*, 2019 WL 3766526, at *10.

### Proximate Cause

The final element of the Counties' FHA claims is causation, and much has been said about it recently in the courts. *See Inclusive Communities*, 135 S. Ct. at 2523–24; *Wells Fargo*, 2019 WL 3766526, at *10; *Cook (Wells Fargo)*, 314 F. Supp. 3d at 990. "[P]roximate cause 'generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct.'" *City of Miami*, 137 S. Ct. at 1306 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). To determine whether proximate cause exists, the court considers "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at

1305 (quoting *Lexmark*, 572 U.S. at 133). When the alleged conduct is a violation of the FHA, such as "lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms," then "foreseeability alone is not sufficient to establish proximate cause." *Id.* What is required is "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 1306 (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)); *City of Miami*, 923 F.3d at 1264 ("Proximate cause asks whether there is a direct, logical, and identifiable connection between the injury sustained and its alleged cause. If there is no discontinuity to call into question whether the alleged misconduct led to the injury, proximate cause will have been adequately pled.").

The Supreme Court observed:

> The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, " 'be expected to cause ripples of harm to flow' " far beyond the defendant's misconduct. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel. And entertaining suits to recover damages for any foreseeable result of an FHA violation would risk "massive and complex damages litigation." *Id.*, at 545, 103 S.Ct. 897.

*City of Miami*, 137 S. Ct. at 1306. The Court left it to the "lower courts [to] define . . . the contours of proximate cause under the FHA." *Id.* But, it did note that, in analogous tort actions, "the general tendency . . . in regard to damages at least, is not to go beyond the first step [of causal links between the triggering event and the resulting harm for which the plaintiff seeks to recover]." *Id.* (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010)). The Court stated that "[w]hat falls within that 'first step' depends in part on the 'nature of the statutory cause of action,' *Lexmark*,

[572 U.S. at 133], and an assessment 'of what is administratively possible and convenient,' *Holmes*, [503 U.S.] at 268." *Id.*

Applying this standard on remand, the Eleventh Circuit noted that "[t]here is give in the joints between 'some direct relation' and 'some direct causation,'" as "some direct relation" does not require causation but rather a "logical bond." *City of Miami*, 923 F.3d at 1272. Additionally, the court observed that "*some* direct relation" is an "easier [standard] to meet" than "a direct relation," as all that is needed is "'an unspecified but appreciable or not inconsiderable quantity, amount, extent or degree.'" *Id.* (quoting *City of Miami*, 137 S. Ct. at 2171). And, it stated that "proximate cause does not always cut off at the first step after a violative act," given that the Supreme Court used the word "generally" and "Supreme Court precedent shows that an intervening step will not vitiate proximate cause in all instances." *Id.* The Eleventh Circuit focused on "the certainty with which [it could] say the injury is fairly attributable to the statutory violation." *Id.*

Here, the Counties claim that they have incurred the following economic damages "on vacant and/or foreclosed minority properties":

1. "costs for judicial and non-judicial foreclosure-related processes" and "services required for Sheriff's evictions and foreclosure notices" ("Foreclosure Processing Costs");

2. "registration and monitoring of abandoned, vacant and/or foreclosed properties"; "inspecting, securing, cleaning, maintaining and/or demolishing abandoned, vacant and/or foreclosed properties"; "police and fire services on abandoned, vacant and/or foreclosed properties for which Defendants are responsible"; and "social services to evicted or foreclosed homeowner-borrowers on abandoned, vacant and/or foreclosed

properties for which Defendants are responsible" ("Increased Municipal Services Costs");

3. "reduced property values on foreclosed properties and surrounding properties"; the loss of various property and concession tax revenue from abandoned, vacant and/or foreclosed properties, including, for example, cable and telephone franchise taxes"; lost property tax revenue on abandoned, vacant and/or foreclosed properties that have not been recovered via tax lien sales" ("Tax Base Injuries"); and

4. "lost revenue from certain utility operations and fees, such as water, sanitation, and telecommunications; and/or [] lost recording fees as a result of the use of MERS to avoid such fees" ("Lost Municipal Income").

Compl. ¶ 386; *see* Defs.' Mem. 5 (summarizing the Counties' alleged injuries). They also claim non-economic damages consisting of "injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities" ("Non-Economic Damages"). Compl. ¶ 387.

The Counties alleged the same injuries in *Wells Fargo*, and I have adopted Judge Messitte's umbrella category names. *See Wells Fargo*, 2019 WL 3766526, at *5–8 & nn.9, 10 ("Foreclosure Processing Costs" include "out-of-pocket expenses associated with processing foreclosures occasioned by Defendants' purported violations, including costs for foreclosure notices, court proceedings, Sheriffs' auctions, Sheriffs' evictions, and registration, monitoring, and maintenance of empty properties"; "Increased Municipal Services Costs" include "damages based on the cost of having to provide municipal services on foreclosed properties, such as fire and police, as well as social services that were needed to assist evicted or foreclosed borrowers"; "Tax Base Injuries" include "reduced property values, loss of property and concession tax revenue, and loss of property tax revenue not recovered via tax lien sales"; "Lost Municipal Income" includes "lost revenue

from certain utility operations and lost recording fees due to Defendants' use of the Mortgage Electronic Registration Systems (MERS), a private system for tracking, assigning, and trading mortgage loan interests"; and "Non-Economic Damages" include "neighborhood deterioration, blight and urban decay, the segregative effects of Defendants' equity-stripping, and the encroachment on the Counties' missions of supporting diverse and inclusive communities"). Given the similarities, the analysis of proximate cause by damages category in *Wells Fargo* provides very helpful guidance.

### 1. Foreclosure Processing Costs

In *Wells Fargo*, the Court found that "[f]oreclosure would be the final process in the discriminatory equity-stripping cycle that the Counties allege Defendants have perpetrated against FHA-protected minority residents," and "[t]he Counties' costs in processing those foreclosures would be a direct first-step consequence of that cycle." 2019 WL 3766526, at *5. Thus, "[i]ncreased foreclosures due to discriminatory subprime lending equate with increased expenses that come directly out of the Counties' budgets to process the foreclosures." *Id.* It observed that "all three courts to consider the claims of Cook County, Illinois were satisfied that similar claims for injuries should go forward." *Id.* (citing *Cook (Wells Fargo)*, 314 F. Supp. 3d at 984 (noting that there could "be no question that proximate cause is satisfied" because foreclosure processing costs were an "integral . . . aspect of the violation alleged"; *Cook (Bank of Am.) II*, 2018 WL 1561725 at *7 (noting that costs associated with foreclosures plausibly fall within the first step), *Cook (HSBC) II*, 314 F. Supp. 3d at 963 (same)). Accordingly, this Court concluded that the Counties sufficiently pleaded "some direct relation" between the Foreclosure Processing Costs and the Banks' alleged FHA violations and "therefore plausibly alleged proximate cause as to these injuries." *Id.*

The same is true here, where the Counties allege, similarly to their allegations in *Wells Fargo*, that "the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory mortgage loan products Defendants sold to homeowners in Plaintiffs' neighborhoods and communities and/or refused to modify or refinance" is "the last wrongful act in the Defendants' scheme." Compl. ¶ 385; *see Wells Fargo* Compl. ¶ 398, ECF No. 1 in *Wells Fargo* (alleging that "the last wrongful act in the Defendants' scheme" was "the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory mortgage loan products Defendants sold to homeowners in Plaintiffs' neighborhoods and communities and continued to service when such loans defaulted and through Defendants' foreclosure processes"). Plaintiffs claim that the "Counties' Sheriff's Departments incur significant costs in serving eviction and foreclosure notices and in evicting homeowners, which are directly tied to the foreclosed property itself." Compl. ¶ 394; *see Wells Fargo* Compl. ¶ 405 ("Plaintiffs' Sheriff's Departments incur significant costs in serving eviction and foreclosures notices and in evicting homeowners, which are directly tied to the foreclosed properties."). And, the Counties "have had to provide supplemental funding" for their "judicial systems and clerk's offices," which "have been overloaded with foreclosure filings and proceedings." Compl. ¶ 395; *see Wells Fargo* Compl. ¶ 406 (same). As in *Wells Fargo*, the Counties sufficiently pleaded "some direct relation" between the Foreclosure Processing Costs and the Banks' alleged FHA violations and "therefore plausibly alleged proximate cause as to these injuries." *See Wells Fargo*, 2019 WL 3766526, at *5. The Banks' Motion to Dismiss is denied with regard to the FHA claims for damages based on the Foreclosure Processing Costs.

## 2. *Increased Municipal Services Costs*

In *City of Miami*, the plaintiffs alleged, "in almost conclusory fashion, that 'the City is required to provide increased municipal services' at foreclosed properties and that 'these services would not have been necessary if the properties had not been foreclosed upon,'" and they "proceed[ed] to list types of expenditures: police, fire, building code enforcement, and the like." 923 F.3d at 1285–86.  The Eleventh Circuit concluded that the plaintiffs' "pleadings fall short of sufficiently alleging 'some direct relation' between the Banks' conduct and a claimed increase in expenditures on municipal services" because "[t]he complaints fail[ed] to explain how these kinds of injuries—increases in police, fire, sanitation, and similar municipal expenses—are anything more than merely foreseeable consequences of redlining and reverse-redlining." *Id.* at 1264.  It stated that "the City's expenditures occur at some obvious level of remove from the foreclosures that it says cause them. They are further down the chain." *Id*. at 1285.  The appellate court reasoned that "the City's complaints fail[ed] to explain how [the court could] ascertain with any level of detail or precision which expenditures will be attributable to the Banks," even though "the entire increase in municipal expenditures over any time period c[ould] not possibly be fairly attributed to the Banks' conduct," as "[i]ntervening causes and independent variables will inevitably run up this measure of damages." *Id.*

In *Wells Fargo*, "the Counties allege, albeit somewhat summarily, that they 'have been required to provide a multitude of services relating to those abandoned, vacant and/or foreclosed properties that would not have been necessary if such properties were occupied.'" 2019 WL 3766526, at *6.  The Counties make the same allegation in the Complaint before me.  Compl. ¶ 391.  They further allege, as they did in *Wells Fargo*:

> By way of example only, Plaintiffs have sustained financial injuries for providing services to such abandoned, vacant or foreclosed homes that have not been cared

25

for, have been vandalized and/or have provided a location for illegal activities, all leading to violations of local building codes, including the creation of physically unsafe structures that threaten public safety. This, in turn, has led to substantial personnel time and out-of-pocket costs incurred by Plaintiffs' building code enforcement and legal functions having to inspect, investigate and respond to violations at such vacant properties that threaten public safety or address public health concerns; and taking legal action to investigate and prosecute building code violations at the vacant properties.

Compl. ¶ 392; *see Wells Fargo* Compl. ¶ 403.

In *Wells Fargo*, this Court observed that the Counties did not, however, "plead specifics about what their injuries are or how they might be identified and isolated." 2019 WL 3766526, at *6. What the Counties did allege there, as here, was that

[u]sing Defendants' loan origination, pricing, servicing and foreclosure data (which include minority borrower status, property addresses, loan default and foreclosure timing information) obtained from Defendants in discovery, Plaintiffs can isolate out-of-pocket and lost revenue damages directly attributable to each individual property secured by a mortgage loan originated, purchased/funded and/or serviced by Defendants pursuant to their discriminatory housing practice . . . .

Compl. ¶ 396; *see Wells Fargo* Compl. ¶ 407. There, as here, they asserted that, following "discovery of Defendants' loan origination, pricing, servicing and foreclosure data," they could establish their "precise and actual damages." Compl. ¶ 405; *see Wells Fargo* Compl. ¶ 417.

The *Wells Fargo* Court found that the alleged injuries were "certainly further removed from Defendants' alleged equity-stripping practices than are the costs associated with processing foreclosures." 2019 WL 3766526, at *6. It reasoned:

Services rendered by a fire or police department may depend on numerous factors other than merely whether it involved a foreclosed-upon property. Similarly, community members allegedly in need of social services as a result of discriminatory lending practices may well have been affected by many more diverse factors than a predatory home loan. The Counties have not alleged any plausible methodology by which they might be able to isolate and identify those municipal services costs which are directly attributable to the complained-of practices.

*Id.* The Court noted that "[o]ther courts considering damage claims for comparable municipal services have in fact found them insufficient to establish probable cause," although the plaintiffs in those cases have sought reconsideration. 2019 WL 3766526, at *6 (citing *Cook (HSBC) II*, 314 F. Supp. 3d at 962–63 ("[T]o the extent that the County incurred additional costs for social services, such injuries are derivative of the injury that HSBC caused to the minority borrowers themselves and, therefore, insufficient to satisfy the directness requirement."); *Cook (Wells Fargo)*, 314 F. Supp. 3d at 988 (concluding that "increased demand for county services" was one of "the 'ripples' that *City of Miami* cautions 'flow far beyond the defendant's misconduct'"); *Cook (Bank of Am.) II*, 2018 WL 1561725, at *5 (concluding that these damages "do not flow directly from the discrimination . . . allege[d]")).[6] The Court permitted the Counties to file an amended complaint to correct these deficiencies. *Id.* For the same reasons, I will grant the Banks' Motion to Dismiss the Counties' FHA claims for damages consisting of increased municipal services costs, but I will allow the Counties to file an amended complaint to address the deficiencies identified in this Memorandum Opinion.[7]

### 3. Tax Base Injuries

One of the most discussed and contested issues courts have considered in cases similar to the present one is whether municipalities have plausibly alleged that practices such as Wells Fargo's alleged equity-stripping scheme proximately caused injuries to the municipalities' tax bases. None of the Cook County [pre-Eleventh Circuit *City of Miami* opinion] decisions allowed injuries based on lost property taxes to go forward.[] *See Cook County (Wells Fargo)*, 314 F. Supp. 3d at 988 (property tax injuries are precisely the ripples that the Supreme Court cautioned against in *City of Miami*); *Cook County (Bank of America)*, 2018 WL 1561725 at *5 ("tax losses... do not flow directly from the discrimination [the County] alleges."); *Cook County (HSBC)*, 314 F. Supp. 3d at 964 ("To the extent the

---

[6] The motion for reconsideration in all three *Cook* cases appear from the docket still to be pending.

[7] Unlike the other dismissals discussed in this Memorandum Opinion and Order where amendment will be permitted, the Counties will not be permitted to undertake discovery in order to address the deficiencies described with respect to these injuries.

County's claim of injury from lower tax revenue is predicated... on a diminishment in a property's value post-foreclosure, this introduces significant concerns about measuring the diminishment in value attributable to HSBC's conduct...").

However, before the *Miami* decision of the Eleventh Circuit, the court in *City of Oakland* held that Oakland had plausibly alleged such injuries by explaining how a regression analysis, specifically a Hedonic analysis, could identify the portion of Oakland's decreased property taxes that could be fairly attributed to Wells Fargo's allegedly discriminatory conduct. *See* 2018 WL 3008538 at *8. The plaintiff's detailed explanation of this analysis was clearly important to the Oakland court, because, by way of contrast, the court dismissed without prejudice Oakland's municipal services claims since it "had proffered no statistical analysis" supporting those claimed injuries. *Id*. at *9.

The Eleventh Circuit accepted an argument similar to that made in *City of Oakland* in *Miami*, citing the same specific type of statistical analysis that influenced the court in *City of Oakland*: a Hedonic regression technique. 923 F.3d at 1268. The Eleventh Circuit discussed the Hedonic regression analysis at length. *See id.* at 1282-85. Ultimately, the Eleventh Circuit concluded that "[t]he plausibility of hedonic regression analysis has a direct bearing on how 'difficult it is to ascertain the amount of [the City's] damage attributable to the violation, as distinct from other, independent, factors, and thus helps determine 'what is administratively possible and convenient,' in terms of damages calculation." *Id*. at 1284 (internal citations omitted). The key for the Eleventh Circuit, then, was not just that Miami had alleged the tax-based injuries; it had specifically set forth how it would prove those injuries, which is to say, isolate them as resulting from Wells Fargo's alleged misconduct, and tie the two together.

*Wells Fargo*, 2019 WL 3766526, at *7; *see City of Miami*, 923 F.3d at 1264 ("The City's pleadings meet this standard because Miami has alleged a substantial injury to its tax base that is not just reasonably foreseeable, but also is necessarily and directly connected to the Banks' conduct in redlining and reverse-redlining throughout much of the City.").

Notably, the Eleventh Circuit, while stating that "step-counting is of limited value" and cannot be a stand-alone approach, did not overlook an intervening step to conclude that the plaintiff sufficiently pleaded "some direct relation"; rather, it stated that the connection should be assessed between the injury and the "distinct FHA violation[] [that] occurred when homeowners already having financial difficulties were attempting to refinance or otherwise modify their loans," instead of between "the point of loan" and the injury. *City of Miami*, 923 F.3d at 1277–78. Because the

FHA violation that caused the tax base injury (foreclosure) occurred at a later point than loan origination, "the variety of factors that . . . might independently explain a homeowner's foreclosure (like the loss of a job or spiking health care costs)"—that is, factors that otherwise would break the connection and negate probable cause—were not "intervening roadblocks" because they occurred prior to foreclosure.  *Id*. at 1277.

Additionally, the Eleventh Circuit did not rely on this causation alone, as this Court noted. *See Wells Fargo*, 2019 WL 3766526, at *7.  Rather, "[i]n no small part, [it] conclude[d] that the City ha[d] adequately -- that is to say, plausibly -- pled proximate cause because [the court] f[ou]nd it entirely practicable and not unduly inconvenient for the courts to handle damages like the City's tax revenue injury."  *City of Miami*, 923 F.3d at 1281 ("As pled, the City's injury is ascertainable with a sufficient degree of precision for some of its economic injuries, specifically the harm to its tax base."); *see Wells Fargo*, 2019 WL 3766526, at *7 (quoted above; discussing ease of assessing injury in *City of Miami*).

This Court determined that the Counties' pleadings in *Wells Fargo* were "not as specific as those in *Miami*," as "[t]hey merely allege[d]" in allegations that were "simply too vague" that

> "[r]outinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiffs have lost as a direct result of Defendants' discriminatory equity-stripping activities ... ," ECF No. 1 at ¶ 412, that they can determine the damage attributable to Wells Fargo's conduct "[u]sing well-established GPS mapping techniques that locate specific properties within census tracks, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques," *id*. at ¶ 413, and that the damages "can be established with statistical evidence and expert testimony." *Id*. at ¶ 418.

2019 WL 3766526, at *7. The Counties make the same vague allegations in this case.  *See* Compl. ¶¶ 400, 401, 406.  In *Wells Fargo*, noting that an analysis other than Hedonic regression analysis could suffice, this Court nonetheless concluded that the Counties' allegations of Tax Base Injuries did not "attain the level of specificity necessary to alleviate concerns such as those expressed by

the court in Cook County (HSBC) and leave open the question of whether the alleged calculations are actually plausible." 2019 WL 3766526, at *7–8. The Court allowed the Counties to amend their pleadings and to seek limited pre-amendment discovery if necessary, stating that "the Counties must do more to show—not just declare—how they propose to isolate the damages to their tax bases attributable to Defendants, such that a 'direct relation' between the two is clear." *Id.* at *8. Given that the pleadings are equivalent in this case and I agree with the analysis in *Wells Fargo*, I will grant the Banks' Motion to Dismiss the Counties' FHA claims for tax base injuries, but I will allow the Counties to take limited and targeted discovery and then file an amended complaint to address the deficiencies identified in this Memorandum Opinion.

### 4. *Lost Municipal Income*

Plaintiffs claim they "lost revenue from certain operations and fees" and "lost recording fees as a result of the use of MERS." Compl. ¶ 386. In *Cook (HSBC) II*, the court concluded (without analysis) that the plaintiff sufficiently pleaded "a squarely direct relationship between [the defendant's] use of the MERS database and the County's resulting loss of recording income." 314 F. Supp. 3d at 965. There, the plaintiff claimed that "HSBC used MERS to allegedly obscure its transactions from public recording systems in an effort to hide its race-based activities." *Id.* at 955.

This Court, like the Illinois district court, also recognized that there could be a direct connection between the Counties' alleged lost municipal income and Wells Fargo's FHA violations and its use of MERS, but it found the pleadings to be lackluster. *Wells Fargo*, 2019 WL 3766526, at *8 ("As to lost revenue from utility operations, the Counties aver little more than to note that they have suffered losses, and that the use of MERS makes it difficult to recover things like utility fees from the correct party. As to specifics referencing the loss of recording fees, the

Counties allege only that 'MERS has saved industry participants—and denied public recording systems operated by County governments such as Plaintiffs here—a total of over $2 billion in public recording fees.' . . . As to lost utility fees, the Counties mention these only in passing and do not in any way flesh out the connection between Defendants' alleged equity-stripping practices and the loss of the fees, nor do the Counties articulate how that link will be calculated with any specificity."). The Court noted that the Counties failed to allege "how much, even by rough estimate, the Counties themselves may have suffered as a result of Defendants' use of MERS" or "how they propose to determine and isolate the causal links." *Id.* Accordingly, it directed the Counties to specify the amount of lost municipal income and how it related to the alleged equity-stripping practices, and the Court permitted them to seek limited pre-amendment discovery in order to do so. *Id.* The allegations in the Complaint before me are substantially the same as those in the *Wells Fargo* Complaint, and I agree with Judge Messitte's analysis. *Compare* Compl. ¶¶ 531–36, *with Wells Fargo* Compl. ¶¶ 376–78. Therefore, I will grant the Banks' Motion to Dismiss the Counties' FHA claims for lost municipal income, but I will allow the Counties to take limited and targeted discovery and then file an amended complaint to address the deficiencies identified in this Memorandum Opinion

### 5. *Non-Economic Damages*

In *Wells Fargo*, as here, "[t]he Counties [sought] to recover for injuries stemming from non-economic as well as economic damages." 2019 WL 3766526, at *8. There, the Counties claimed injury from "the segregative effects of increased foreclosures on minority homeowners, neighborhood blight, and urban decay," *id.* (quoting *Wells Fargo* Compl ¶ 391–93); here, they do not mention "the segregative effects" but they do claim "injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities," Compl. ¶ 387. In both cases, they

claim injury from "the 'frustration of the various purposes and missions of [their] departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for their residents at large.'" *Id.* (quoting *Wells Fargo* Compl. ¶ 415); *see* Compl. ¶ 403. They also claim in both cases that "county-based entities have had 'to reallocate their human and financial resources away from their missions and purposes in order to address the foreclosure and home vacancy crisis caused in party by Defendants' discriminatory and predatory mortgage lending, servicing and foreclosure practices.'" *Wells Fargo*, 2019 WL 3766526, at *8 (quoting *Wells Fargo* Compl. ¶ 415); *see* Compl. ¶ 403).

This Court concluded in *Wells Fargo* that the causal link to these alleged injuries was "a bridge too far." *Wells Fargo*, 2019 WL 3766526, at *8. Noting that one court declined to dismiss FHA claims for similar non-economic damages, *id.* at *9 (citing *City of Philadelphia v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at *5 (E.D. Pa. Jan. 16, 2018)), this Court instead "join[e]d the courts that have rejected these non-economic claims as too far removed from the alleged discriminatory conduct to be plausibly proximately caused by such actions," *id.* (citing *Cook (Bank of Am.) II*, 2018 WL 1561725 at *5–7; *Cook (Wells Fargo)*, 314 F. Supp. 3d at 989–90; *Cook (HSBC)*, 314 F. Supp. 3d at 970). It permitted the Counties' claims for injunctive and declaratory relief to proceed because "the proximate cause requirements [are] less strict." *Id.* I agree that deterioration and urban blight lack a sufficiently direct relationship to the alleged equity-stripping scheme to satisfy the FHA's proximate cause requirement, and Defendants' Motion to Dismiss the claims for those damages is granted. *See City of Miami*, 137 S. Ct. at 1306; *Wells Fargo*, 2019 WL 3766526, at *9. The claims for injunctive and declaratory relief, however, may proceed.

**<u>ORDER</u>**

For the reasons stated in this Memorandum Opinion and Order, it is, this <u>30th</u> day of <u>September</u>, <u>2019</u>, hereby ORDERED that

1. Defendants' Motion to Dismiss, ECF No. 48, IS GRANTED IN PART and DENIED IN PART as follows:

    a. The motion is denied insofar as Defendants sought dismissal of claims based on statute of limitations and dismissal of all claims against Countrywide and Merrill;

    b. The motion is denied as to the claims for damages based on Foreclosure Processing Costs;

    c. The motion is granted as to the other claims for damages (from Increased Municipal Services Costs, Tax Base Injuries, and Lost Municipal Income, Non-Economic Damages); and

    d. The claims for injunctive and declaratory relief may proceed;

2. Plaintiffs may file an amended complaint to address the pleading deficiencies with regard to damages from Increased Municipal Services Costs, Tax Base Injuries, and Lost Municipal Income;

3. Plaintiffs will be permitted 60 days in which to take limited, targeted discovery related to their Tax Base Injuries and Lost Municipal Income Injuries prior to filing their amended complaint. And, to ensure compliance with this deadline and the limited scope of the discovery I am allowing, I will refer this to a United States Magistrate Judge to superintend the process. In this regard, the amended complaint will be filed by January 6, 2020, unless extended by the Court; and

4. For the claims that are proceeding at this time, as well as the claims for damages from Increased Municipal Services Costs, Tax Base Injuries, and Lost Municipal Income, the time for Defendants to answer or comply with the pre-motion conference requirements, *see* ECF No. 18, is extended to 14 days after Plaintiffs file an amended complaint.

_____/S/_____

Paul W. Grimm
United States District Judge

lyb