IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MONTGOMERY COUNTY, MARYLAND, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>*Defendants*. | Case No.: 1:18-cv-03575-PWG |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO PARTIALLY DISMISS PLAINTIFFS' AMENDED COMPLAINT

Thomas M. Hefferon (No. 15109)
Sabrina Rose Smith (No. 17738)
Matthew S. Sheldon (admitted *pro hac vice*)
Andrew Kim (admitted *pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Tel.:  202.346.4000
Fax.:  202.346.4444
*THefferon@goodwinlaw.com*
*SRoseSmith@goodwinlaw.com*
*MSheldon@goodwinlaw.com*
*AndrewKim@goodwinlaw.com*

*Counsel for Defendants*

January 17, 2020

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................................1

ARGUMENT...................................................................................................................................3

I.     THE PROPERTY TAX INJURY REMAINS DEFICIENTLY PLEADED
FOR MULTIPLE REASONS........................................................................................3

        A.     The Counties' property tax systems do not operate in a manner that could
give rise to recoverable damages in this case. ..........................................................3

        B.     The Counties have failed to rectify the proximate cause deficiencies
recognized by this Court, and the new property tax system allegations only
deepen those deficiencies...........................................................................................5

        C.     The Counties do not have Article III standing to seek damages for their
Property Tax Injuries. ..............................................................................................10

II.     THE RE-ALLEGED MUNICIPAL SERVICES INJURY STILL REMAINS
TOO REMOTE FOR THE COUNTIES TO RECOVER. ...........................................13

        A.     The Counties admit that their Municipal Services Injuries were the result
of independent, intervening causes. .........................................................................14

        B.     The Counties cannot plausibly establish proximate causation because their
purported methodology cannot isolate any Municipal Services Injuries that
are directly attributable to Defendants.....................................................................17

III.     THE COUNTIES' NEWLY CREATED FRANCHISE TAX INJURY IS
THE SORT OF COLLATERAL INJURY FOR WHICH RECOVERY IS
BARRED BY THE SUPREME COURT.........................................................................19

        A.     The Amended Complaint fails to establish that the Franchise Tax Injury is
caused directly by Defendants' conduct. .................................................................19

        B.     The Counties' Franchise Tax Injury is also impermissibly derivative. ..................20

IV.     THE COUNTIES' GENERALIZED AMENDED ALLEGATIONS ARE
NOT SUFFICIENT TO SATISFY RULE 8...................................................................23

CONCLUSION ............................................................................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................14

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017)................................................................................ *passim*

*In re Birmingham*,
    846 F.3d 88 (4th Cir. 2017) ...................................................................................25

*Boardley v. Household Fin. Corp. III*,
    39 F. Supp. 3d 689 (D. Md. 2014).........................................................................14

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)..................................................................................................7

*City of Miami v. Wells Fargo & Co.*,
    923 F.3d 1260 (11th Cir. 2019) ................................................................... *passim*

*City of Oakland v. Wells Fargo Bank, N.A.*,
    No. 15-cv-04321, 2018 WL 3008538 (N.D. Cal. June 15, 2018)................14, 15, 18

*City of Sacramento v. Wells Fargo & Co.*,
    No. 18-cv-416, 2019 WL 3975590 (E.D. Cal. Aug. 22, 2019)................................14

*Cty. of Cook v. Bank of Am. Corp.*,
    No. 14 C 2280, 2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ................................14

*Cty. of Cook v. HSBC N. Am. Holdings Inc.*,
    314 F. Supp. 3d 950 (N.D. Ill. 2018) .....................................................................14

*Cty. of Cook v. Wells Fargo & Co.*,
    314 F. Supp. 3d 975 (N.D. Ill. 2018) .....................................................................14

*Finkelman v. Nat'l Football League*,
    877 F.3d 504 (3d Cir. 2017)....................................................................................24

*Hardrick v. Canter*,
    No. 11-cv-3032-DKC, 2012 WL 5409739 (D. Md. Nov. 5, 2012) ........................19

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)...........................................................................................21, 22

*Johnson v. Annapolis Yacht Yard, Inc.*,
  Nos. 450, 451, 1984 WL 2899 (Md. Tax. Ct. Sept. 10, 1984)....................................................8

*L.A. Unified Sch. Dist. v. Citigroup Inc.*,
  No. 14-cv-7368, 2015 WL 476303 (C.D. Cal. Feb. 3, 2015) .................................3, 11, 12, 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)........................................................................................................21, 22, 23

*Libertarian Party of Va. v. Judd*,
  718 F.3d 308 (4th Cir. 2013) .................................................................................................24

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)................................................................................................................11

*Macht v. Dep't of Assessments of Balt. City*,
  296 A.2d 162 (Md. 1972) .........................................................................................................8

*Midgal v. Rowe Price-Fleming Int'l, Inc.*,
  248 F.3d 321 (4th Cir. 2001) .................................................................................................25

*Montgomery Cty. v. Bank of Am. Corp.*,
  No. 18-3575-PWG, 2019 WL 4805678 (D. Md. Sept. 30, 2019).................................... *passim*

*Philips v. Pitt Cty. Mem'l Hosp.*,
  572 F.3d 176 (4th Cir. 2009) ...................................................................................................4

*Prince George's Cty. v. Wells Fargo & Co.*,
  397 F. Supp. 3d 752 (D. Md. 2019).................................................................14, 15, 18, 20

*Red Roof Inns, Inc. v. Scottsdale Ins. Co.*,
  419 F. App'x 325 (4th Cir. 2011) ............................................................................................6

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
  884 F.3d 489 (4th Cir. 2018) .........................................................................................10, 16

*St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert Cty.*,
  514 A.2d 1215 (Md. 1986) .......................................................................................................9

*Turner v. JPMorgan Chase, N.A.*,
  No. 14-cv-0576, 2015 WL 5021390 (D. Md. Aug. 21, 2015)................................................25

*Warth v. Seldin*,
  422 U.S. 490 (1975).........................................................................................................11, 13

**STATUTES**

Md. Code Tax-Prop. § 2-203 .......................................................................................................8

Md. Code Tax-Prop. § 6-202 ................................................................................................3

Md. Code Tax-Prop. § 6-302 ................................................................................................3

iv

**INTRODUCTION**

In their original Complaint, Montgomery County and Prince George's County alleged that they suffered various injuries due to Defendants discriminating against minority borrowers in originating, servicing, and foreclosing on the borrowers' mortgage loans. This Court dismissed the allegations seeking recovery for the bulk of the asserted injuries.[1] In particular, it deemed the purported property tax, municipal services, and lost municipal income injuries to be too distant and remote from Defendants' alleged acts of discrimination to meet proximate cause requirements. But instead of dismissing those damages claims with prejudice, this Court gave the Counties a chance to amend their Complaint, so that they could plausibly allege that those damages fall within the "first step" of causation from the purported FHA violations. *See Montgomery Cty. v. Bank of Am. Corp.*, No. 18-3575-PWG, 2019 WL 4805678 (D. Md. Sept. 30, 2019). The Counties have now filed their Amended Complaint—and the deficiencies remain. This Court should dismiss the injury claims again, this time with prejudice.

This Motion addresses three injuries: (1) property taxes allegedly lost from the depressed property values of foreclosed homes ("Property Tax Injury"), (2) the cost of providing municipal services to foreclosed and abandoned homes ("Municipal Services Injury"), and (3) other lost income, which the County has now revised to be focused only on purportedly lost franchise and utility taxes ("Franchise Tax Injury").[2] In its dismissal order, the Court told the Counties they had to "show—not just declare" how each of these injuries was proximately caused by Defendants'

---

[1] Given this is a second motion to dismiss, Defendants will not repeat the facts of the case or prior arguments for dismissal that this Court disagreed with, although Defendants reserve the right to raise such arguments at a later stage in the litigation. ECF No. 48-1.

[2] This Motion does not address the alleged injury due to the cost of processing home foreclosures, which this Court did not previously dismiss. *See* Am. Compl. ¶¶ 409-414. The Counties have also somewhat rebranded their non-economic injury, though it remains unclear what the exact injury is or what non-monetary relief would address it. *See* Am. Compl. ¶ 421.

1

alleged misconduct. The Counties have not done this. Instead, the Counties fail to allege any quantifiable drop in tax revenue based on Defendants' alleged conduct, fail to identify a single municipal service it provided due solely to the acts or omissions of Defendants, and fail to show the Court that they have any method for directly attributing purported lost franchise taxes to conduct by the Defendants. The Counties' pleading failures continue to exist here and cannot be overcome because (i) their property tax assessment processes redistribute tax burdens, rather than take in less revenue, such that the Counties actually suffered no direct injury due to foreclosures; (ii) they cannot identify a single municipal service that was necessary due to Defendants' conduct, rather than intervening bad acts; and (iii) they cannot show that loss of franchise taxes, suffered when a consumer ceases to use certain taxable services like cable television, is attributable to the acts of Defendants rather than changing consumer tastes.

Instead, the Counties offer generalized allegations that a still-unexplained statistical analysis will somehow reveal a direct link between Defendants' conduct and all three of the previously rejected damages claims. They also promise that a more sufficient explanation can be offered in the future, so long as they are allowed to survive a Rule 12(b)(6) challenge on the promise that forthcoming discovery will establish their causal allegations. These allegations do not satisfy this Court's directive that the Counties show, not just declare, that they are entitled to recovery. And the new allegations do nothing to address this Court's stated concerns that the Counties' proposed injuries appear to have been caused by a variety of third party actors and intervening events, not Defendants.

All three injuries continue to fail this Court's stated proximate cause standard, and the new allegations raise new problems. For example, the Counties' revised allegations about their lost property taxes are the same type of injury allegations that have been rejected by two different

courts in similar cases.  The Counties now claim they suffered an injury not because they lost tax revenue, but because taxpayers *not* affected by purported discrimination had to shoulder more of the tax burden to make up for the reduced contribution from foreclosed properties.  But the Northern District of Illinois held just last month that such an "injury" is unrecoverable under the FHA, and that Cook County (which made the same injury argument) pleaded itself out of proximate causation.  ECF No. 423, at 7, *Cty. of Cook v. Bank of Am. Corp.*, No. 1:14-cv-2280 (N.D. Ill. Dec. 19, 2019) (attached as Exhibit A).  Another court concluded that such a property tax injury of "redistribution" was not an Article III injury at all.  *L.A. Unified Sch. Dist. v. Citigroup Inc.*, No. 14-cv-7368, 2015 WL 476303 (C.D. Cal. Feb. 3, 2015).  For the reasons detailed below, all three injuries should be dismissed with prejudice.

## ARGUMENT

### I.     The Property Tax Injury remains deficiently pleaded for multiple reasons.

#### A.     The Counties' property tax systems do not operate in a manner that could give rise to recoverable damages in this case.

In both Counties, the property tax process starts not with the setting of a tax rate, but with each county government deciding how much money it needs in property taxes for a given year, known as the levy amount.  Once the Counties set their overall dollar target for tax collection, they divide that target by the aggregate value of all properties in their respective borders to determine the tax rate that will allow them to collect their levy amounts.  *See* Am. Compl. ¶ 395; *see also* Md. Code Tax-Prop. §§ 6-202, 6-302(a).  As a result, the Counties' tax revenue does not rise and fall depending on the number of properties subject to the levy (or how much those properties are worth); instead, it is a fixed total that is determined first, and then divided among the total number of leviable properties.

This property tax structure creates a fundamental problem for the Counties—because

3

individual property tax assessment amounts or changes are irrelevant to the total amount the Counties levied and collected, the existence of foreclosures, whether "discriminatory" or not, have never affected their bottom-line property tax revenue. Unsurprisingly, this is reflected in the public tax records. In Montgomery County, the amounts levied and collected from taxpayers remained relatively steady, with a trend of ticking upward.[3]  *See* Exhibit B. Prince George's County has similarly obtained all of the money that it has levied year over year, with little difficulty in collection. *See* Exhibit C.

As a result, even given a chance to amend, the Counties do *not* and cannot allege that their overall property tax revenues have gone down because of Defendants' alleged conduct, as they must. Rather, the "Injury" that the Counties plead is one of reallocation: they allege that they had to receive more from households unaffected by Defendants' purportedly discriminatory acts to make up for receiving less from affected foreclosed properties. Am. Compl. ¶ 401 (injury is one of redistribution).

Recognizing that they cannot plead or prove any diminishment in overall tax revenue, the Counties claim that they have nevertheless suffered a "Property Tax Injury" in two ways. First, they hypothetically suggest that *if* the Counties are limited to a certain millage rate (which, by their own separate admission, they are not), they will purportedly be "directly injured when the value of their tax bases decline." Am. Compl. ¶ 396. Second, acknowledging that they do, in fact, "raise millage rates," the Counties assert that they are nevertheless injured because they are "forced" to receive property taxes from "other taxpayers, neighborhoods, and communities," as the "increase[] in millage rate . . . redistributes the property tax burden." Am. Compl. ¶ 401. In other words, their

---

[3] This Court may take judicial notice of the Counties' tax records, as they are available in the public record. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

"injury" is that "they will collect significantly less in property taxes" from "residential properties that have experienced declines in value due to foreclosures," even though they receive the property taxes from elsewhere. Am. Compl. ¶ 402.

The asserted tax process and injury yield two problems fatal to the Counties' ability to recover anything related to property taxes here, the lack of: (i) proximate cause, and (ii) Article III standing.

**B.      The Counties have failed to rectify the proximate cause deficiencies recognized by this Court, and the new property tax system allegations only deepen those deficiencies.**

In their first Complaint, the Counties alleged that they were injured because "tax receipts have fallen on vacant or foreclosed properties," Compl. ¶ 398, and that "well-established statistical regression techniques" would show that "Defendants' discriminatory and predatory lending practices" were responsible for that injury, Compl. ¶ 401. This Court concluded that these "vague allegations . . . did not attain the level of specificity" required to show proximate cause, and left open "the question of whether the alleged calculations are actually plausible." *Montgomery Cty.*, 2019 WL 4805678, at \*16. The Amended Complaint's Property Tax Injury allegations are just as vague as those allegations previously rejected by this Court, thus demonstrating that the Counties cannot meet their burden of alleging a direct causal chain. *Compare* Am. Compl. ¶ 390, *with* Compl. ¶ 401 ("Using well-established GPS mapping techniques . . . and well-established statistical regression techniques, Plaintiffs' injuries are attributable to lost property tax digests can be calculated for properties that surround foreclosures resulting from Defendants' discriminatory and predatory lending practices.").

The FHA requires a plaintiff to demonstrate that "'the harm alleged has a sufficiently close connection to the conduct the statute prohibits.'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

133 (2014)). "[F]oreseeability alone is not sufficient to establish proximate cause"—"[a] violation of the FHA may . . . be expected to cause ripples of harm to flow far beyond the defendant's conduct," but "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel." *Id.* at 1305-06 (citation and internal quotation marks omitted).

At the outset, the Counties seem to be confused about what proximate cause is. The Counties appear to believe that "proximate causation" means "but for" causation—that is, Defendants' discrimination played a role in the chain of events leading to their injuries. *See* Am. Compl. ¶¶ 329 ("But for Defendants' predatory and discriminatory actions alleged herein . . . Plaintiffs' alleged injuries would not have occurred to the extent they did."); 448 (same); 405 ("lost revenue . . . but for the vacancy"). The problem with the Counties' understanding is that "but for" and "proximate" causation are two different things. "But for" causation is "a loose cause and result relationship"—proximate cause is not. *Red Roof Inns, Inc. v. Scottsdale Ins. Co.*, 419 F. App'x 325, 333-34 (4th Cir. 2011). Proximate cause "requires a more stringent, direct link between the cause of the injury and the resulting injury." *Id.* In the FHA context, proximate cause demands an injury be within the "first step" of damages in order to be recoverable, such that there is "some direct relation between the injury asserted and the injurious conduct alleged." *See Bank of Am.*, 137 S. Ct. at 1306 (citations omitted).

None of the Counties' new Property Tax Injury allegations establishes the causal chain that this Court was looking for in the original Complaint. The Amended Complaint still relies on the promise that, using "Hedonic regression techniques," the Counties will eventually be able to "accurately and confidently isolate the amount of their tax base-related damages that were directly caused by Defendants' discriminatory practices, as opposed to other factors." Am. Compl. ¶ 400.[4]

---

[4] Appended to the Counties' Amended Complaint is an unusual expert declaration that purports to

This Court chided such an allegation as merely telling, not showing, and concluded that proximate cause was not established with such an allegation—and it should conclude so again. *Montgomery Cty.*, 2019 WL 4805678, at \*16 (holding that the Counties' burden is "to show—not just declare"). The Counties now provide more details about the "statistical regression techniques" the Counties intend on using, Am. Compl. ¶¶ 387-389, such as the laundry list of factors that the Counties' experts may evaluate, *id.* ¶ 389. But they do not explain *how* the "direct relation" demanded by *Miami* will be shown, only that such an extrapolation will eventually be made. If merely alleging that a regression analysis will eventually yield proof of some statistical relationship between Defendants' alleged conduct and the Counties' Property Tax Injuries was not enough for this Court with respect to the original Complaint, it should not be enough to sustain the Amended Complaint's allegations about the Property Tax Injuries, either. 2019 WL 4805678, at \*16.

If anything, the Counties have pleaded themselves out of proximate causation by confirming the presence of intervening causes that break the causal chain. This makes it impossible for the Counties to establish that there is a "direct relation" between Defendants' alleged conduct and the Counties' Property Tax Injuries. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (proximate cause "limit[s] a person's responsibility for the consequences of that person's *own acts*, . . . as distinct from other, independent factors" (citation omitted)); *see Montgomery Cty.*, 2019 WL 4805678, at \*15 (causal chain must not be affected by "intervening roadblocks," i.e., "factors that otherwise would break the connection and negate

---

further explain how the Counties will "isolate the causal links between Defendants' actions and the Counties' damages[] as well as quantify those damages." Cowan Decl. ¶ 1. Although the expert claims that he will be able to show what a foreclosed property would have been worth but for the foreclosure, Cowan Decl. ¶ 18, his discussion of how he intends to connect the drop in value to Defendants' conduct is sparse. The expert only states that he will conduct a regression analysis to establish the link—an analysis that, by his own admission, will only "fairly" attribute Defendants' conduct to a calculated drop in assessed value. *See* Cowan Decl. ¶ 20.

[proximate] cause").

For example, how much the Counties receive in property taxes is the result of the Counties' own political decisionmaking, not Defendants' alleged conduct. Put differently, the amount that the Counties receive in property tax funding depends almost entirely on how much the Counties decide to levy in total taxes—the levy amount then works itself through a "complicated tax differential equation" that determines how much an individual taxpayer will pay. *See Johnson v. Annapolis Yacht Yard, Inc.*, Nos. 450, 451, 1984 WL 2899, at *13 (Md. Tax. Ct. Sept. 10, 1984). It is the Counties' taxation and political systems that determine their property tax revenue amounts, not the Defendants' conduct. The Counties have not alleged that Defendants' purported actions have had any effect or impact on the Counties' setting of tax levy amounts—and those amounts singlehandedly determine how much the Counties will collect in revenue.

To provide another example, the Counties have conceded that their causal chain is also affected by the independent discretion of the Maryland Department of Assessment and Taxation (the State Assessor). *See* Am. Compl. ¶ 398. The Counties allege that the Assessor may consider multiple factors in determining the fair market value of a home for assessment purposes. *See* Am. Compl. ¶¶ 399-400. Indeed, under state law, "it has long been established that assessors have reasonable latitude" in valuating real property, "so long as they arrive at the 'full cash value.'" *Macht v. Dep't of Assessments of Balt. City*, 296 A.2d 162, 166 (Md. 1972) (citation omitted). Part of that discretion is the Assessor's alleged ability to apply a "Neighborhood Adjustment," which "*allows* for market factors to be applied and influence[] the value of the property." Am. Compl. ¶ 399 (emphasis added). The State Assessor's discretion also includes the ability to avoid assessing a real property individually, and instead evaluating real property in "group[s]" in any "manner that the Department considers to be helpful or necessary." Md. Code Tax-Prop. § 2-

203(b).  Given that assessment is not "an exact science" and the valuation of property largely depends on the discretion of an individual Assessor, *St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert Cty.*, 514 A.2d 1215, 1219 (Md. 1986), the Assessor's responsibilities serve as an independent, intervening factor that breaks the chain of proximate causation, such that there is no "direct relation" between Defendants' purported conduct and the Counties' Property Tax Injuries.

The Counties have acknowledged these independent, intervening factors, but their purported methodology *fails to address them in any way*.  The Counties fail to explain how their regression analysis will exclude factors such as the Counties' political decisionmaking as to the levy amount or the State Assessor's independent exercise of discretion in calculating assessed values—likely because these factors are not independently quantifiable at all.  The Counties cannot prove "some direct relation," as *Miami* requires, when their Amended Complaint acknowledges that *other* forces directly control their property tax revenue amounts, not Defendants' conduct.

Only one court has ever addressed a municipality's attempt to recover a property tax injury under the FHA where it had a taxation structure like the Counties' here.  That Court just affirmed last month that this type of taxation system *forecloses* any ability of the municipality to seek to recover for "lost" property taxes due to alleged discrimination.  In that case, the Northern District of Illinois held that having a property tax system that sets an overall levy amount first, then a tax rate, impermissibly injects the political decisionmaking process into the causal chain and makes the alleged "tax losses . . . too remote to satisfy *City of Miami*'s standard for proximate causation." ECF No. 423, at 7, *Cty. of Cook v. Bank of Am. Corp.*, No. 1:14-cv-2280 (N.D. Ill. Dec. 19, 2019) (attached as Exhibit A).  Like the Counties here, Cook County alleged that it suffered a Property Tax Injury because "foreclosures would have required the County to raise its Tax Rate to a level

9

higher than it would have been," despite the fact that "its total property tax revenue was relatively stable." *Id.* at 3-4. The *Cook County* court held that such a claim did not satisfy *Miami*'s proximate cause test. Even if the foreclosures played a factor in Cook County's political decisionmaking, the court held that "numerous other factors—social, political, and economic" bore on the County's "exercise of its taxing authority." *Id.* at 5. As a result, the court concluded "there is nothing plausibly resembling a direct causal chain between defendants' misconduct and the far-reaching negative effects the County attributes to an increase in tax rates." *Id.* at 6.

Because the Counties have failed to account for these independent intervening factors as part of their methodological allegations, this Court would be forced to make assumptions about the causal chain in order for the Counties to recover for their Property Tax Injuries—assumptions that the Court is not permitted to make. *See Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 495 (4th Cir. 2018) (assumptions about the causal chain "are precisely what prompted the Supreme Court to adopt the proximate cause requirement"). For example, the Court would have to make assumptions about how the State Assessor exercised its independent discretion in property valuation, and how purported foreclosures and the alleged impact on home values affected the political decisionmaking of the Counties. Because the Court cannot make assumptions about how these "intervening roadblocks" would play out, the Counties cannot meet their burden of showing "some direct relation" between Defendants' conduct and their purported Property Tax Injuries. *Montgomery Cty.*, 2019 WL 4805678, at *15.

### C. The Counties do not have Article III standing to seek damages for their Property Tax Injuries.

Separate and apart from the proximate cause failure, the Counties also cannot show that they have Article III standing to recover the Property Tax damages. A fundamental component of constitutional standing is an injury-in-fact—"an invasion of a legally protected interest which is

(a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation and internal quotation marks omitted). "[T]he plaintiff must generally assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The Counties do not and cannot meet this standard due to the nature of their property taxation systems.

In their allegations about the Property Tax Injuries, the Counties have failed to allege facts showing that they have suffered any injury in fact. Most notably, the Counties have *not* alleged that they have suffered a drop in overall property tax revenue. Nor could they, for the Counties allege that, when they lose one dollar from a foreclosed property, they simply receive that dollar from other taxpayers by raising the tax rate. *See* Am. Compl. ¶ 401 ("[A]n increase[] in millage rate is applied across all similar properties, it redistributes the property tax burden and the collection of property taxes from foreclosed homes (and communities with many foreclosures) onto other taxpayers, neighborhoods, and communities with fewer foreclosures."). Indeed, the Counties *could not* allege that they have lost any property tax revenue, because the numbers simply do not bear it out: the Counties have consistently received the amount of money they have levied, year over year. *See* Exs. B & C.

Instead, the Counties allege that they are entitled to recover for their respective Property Tax Injuries because they will collect "significantly less in property taxes" *from certain properties*, and because they must "redistribute the property tax burden" to others. Am. Compl. ¶¶ 401-402. But these allegations demonstrate the Counties have suffered *no* "actual" injury in fact. *See Lujan*, 504 U.S. at 560-61.

A California district court concluded as much in *Los Angeles Unified School District v.*

11

*Citigroup Inc.*, No. 14-cv-7368, 2015 WL 476303 (C.D. Cal. Feb. 3, 2015).  In that case, the Los Angeles Unified School District alleged that a bank's "discriminatory and unlawful lending practices, which targeted African-American and Latino borrowers, caused a disproportionately high number of foreclosures in historically underserved minority communities within LAUSD's boundaries," which "resulted in vacant homes and depressed property values for surrounding properties, thus leading to a decrease in property tax revenue." *Id.* at *1.  In a Rule 12(b)(1) motion to dismiss, the bank argued that the school district did not actually lose any money or funds.  The school district's funding was made up of two parts:  (1) local property tax revenue and (2) the state education fund.  *Id.* at *3.  When the school district received less from property taxes, the state fund made up the difference.  *Id.*  The school district nevertheless tried to claim that it was still injured because it was receiving less in property taxes in isolation, *i.e.*, regardless of what it was receiving from the state fund.  *Id.* at *3-*4.

The court rejected the plaintiff's arguments and dismissed the claims with prejudice.  It held that the school district had failed to allege any property tax injury because the injury, as described, was "purely abstract," an "intangible injury resulting from the knowledge that the source of the funding changed."  *Id.* at *4 (citation omitted).  This "mere knowledge of a change in funding," the court held, "is not a 'particular, direct, and concrete injury' necessary to establish Article III standing."  *Id.*

So too here.  The Counties' Property Tax Injury rests entirely on the assertion that the *source* of their property tax revenue matters, *i.e.* that the Counties are injured when certain taxpayers pay the Counties money rather than others.  Am. Compl. ¶ 401.  But much like the school district's property tax "injury" in *Los Angeles Unified School District*, the Counties' asserted Injury is "purely abstract," an "intangible injury resulting from the knowledge that the source of

12

the funding changed" for which the Counties cannot recover.  2015 WL 476303, at *4 (citation omitted).  If anything, the Property Tax Injury is the alleged injury of another—other taxpayers paying more in taxes—masqueraded as an injury to the Counties.  Article III does not allow the Counties to rest their "claim to relief on the legal rights or interests of third parties."  *Warth*, 422 U.S. at 499.

## II.    The re-alleged Municipal Services Injury still remains too remote for the Counties to recover.

This Court previously concluded that the Municipal Services Injury, as alleged in the original Complaint, was "further removed from Defendants' alleged equity-stripping practices," and thus the injury failed to satisfy the FHA's proximate causation requirement.  *Montgomery Cty.*, 2019 WL 4805678, at *14.  Despite this admonition, the Counties' allegations about their respective Municipal Service Injuries have changed very little.  The Amended Complaint merely repeats the Counties' previous allegations that they have provided "a variety of governmental services relating to vacant and/or foreclosed properties," such as responding to purported "public health and safety threats that arise specifically because the properties are vacant."  Am. Compl. ¶ 415.  Tellingly, they do not identify a single property serviced or a single service event provided. The Counties instead claim that they will prove their Municipal Services Injuries by identifying the properties purportedly affected by Defendants' allegedly discriminatory practices, and by comparing those addresses to addresses in the Counties' databases that received services from "police and fire departments and other municipal services functions."  Am. Compl. ¶¶ 419-420.

If this Court were to allow this type of damages, it would be the first to ever do so.  No court has ever allowed a municipal plaintiff to recover for Municipal Services Injuries based on allegations like the ones here because such a theory of damages cannot satisfy the FHA's

requirement of direct proximate cause.[5]  As the Eleventh Circuit observed (and this Court agreed), such expenditures "occur at some obvious level of remove from the foreclosures that [purportedly] cause them."  *City of Miami*, 923 F.3d at 1285; *Montgomery Cty.*, 2019 WL 4805678, at *13.  This Court gave the Counties an opportunity to plead allegations that would "isolate and identify those municipal services costs which are directly attributable to the complained-of practices."  *Id.* at *14 (citation omitted).  But the Counties' renewed allegations do not come close to accomplishing that objective.

> **A.     The Counties admit that their Municipal Services Injuries were the result of independent, intervening causes.**

At the outset, the Counties' allegations about their Municipal Services Injuries remain threadbare—and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Boardley v. Household Fin. Corp. III*, 39 F. Supp. 3d 689, 710-12 (D. Md. 2014) (Grimm, J.).  The "injury" consists of the bare assertions that the Counties' municipal departments, including "police and fire departments," had to "send personnel and equipment to vacant properties," so that they could

---

[5] Numerous courts (including this one) have considered similar municipal-expenditure arguments, and each has rejected the municipal-expenditure theory of injury.  *See* Op. at 26-27; *Prince George's Cty. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 761-62 (D. Md. 2019); *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1294 (11th Cir. 2019) (affirming dismissal of "increased municipal expenditures injury" because increased costs were "not  . . . plausibly presented as directly and automatically resulting from the [defendant's] conduct"); *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-cv-04321, 2018 WL 3008538, at *9-10 (N.D. Cal. June 15, 2018), *appeal docketed*, No. 19- 15169 (9th Cir. Feb. 28, 2019) (dismissing municipal-expenditure injury); *Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 962-63 (N.D. Ill. 2018) (dismissing claim for costs of social services provided to foreclosed homeowners); *Cty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2018 WL 1561725, at *4-7 (N.D. Ill. Mar. 30, 2018) (dismissing claim for increased cost of county services, including police patrol and borrower support services); *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 988-89 (N.D. Ill. 2018) (same); *City of Sacramento v. Wells Fargo & Co.*, No. 18-cv-416, 2019 WL 3975590, at *9-10 (E.D. Cal. Aug. 22, 2019) (dismissing claim for cost of police, fire, and social services).

"inspect, investigate, repair, clean up, monitor, and/or respond to events."  Am. Compl. ¶¶ 415-416, 419.  The Counties then allege that they will look up whether the properties affected by Defendants' purported conduct received municipal services while foreclosed or abandoned.  Am. Compl. ¶ 419.  The Eleventh Circuit in *Miami* found such allegations to be insufficient because the court could not "ascertain with any level of detail or precision which expenditures will be attributable to the Banks," and "the *entire* increase in municipal expenditures over any time period cannot possibly be fairly attributed to the Banks' conduct."  923 F.3d at 1285.  This Court should reach the same conclusion about the Counties' Municipal Services Injury here.

The Counties have not made new allegations here because it is impossible for the Counties to allege a "direct relation" between Defendants' conduct and the Counties' Municipal Services expenditures; such a causal chain necessarily would be broken up by independent, intervening influences.  *See Prince George's Cty. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 760 (D. Md. 2019) (proximate cause requires an injury "without a discontinuity that breaks the connection").  As this Court explained, "[i]ntervening causes and independent variables will inevitably run up [municipal expenditure] damages," as the Counties' "expenditures occur at some obvious level of remove."  *Montgomery Cty.*, 2019 WL 4805678, at *13.  And municipal services, such as those "rendered by a fire or police department may *depend on numerous factors*."  *Id.* at *14 (emphasis added).  By its very nature, a municipal-expenditure "injury" like the one alleged by the Counties here will necessarily be "indirect and derivative," and thus, barred by the FHA's proximate cause requirement.  *City of Oakland*, 2018 WL 3008538, at *10.

The Amended Complaint confirms this defect.  The Counties concede that their expenditures result from (1) independent acts by bad actors who "vandalize," conduct "illegal activities," or "dump[] garbage" at the properties"; and/or (2) third parties who fail to keep

15

properties up to code or up to health and safety standards.  Am. Compl. ¶ 416.  The Counties fail to explain why proximate cause exists despite these independent, intervening factors.  *City of Miami*, 923 F.3d at 1294.

Instead, the Counties' theory of proximate causation asks this Court to assume that Defendants' alleged discrimination (and nothing else) is responsible for those injuries, and turn a blind eye to the other independent causes of the Municipal Services Injuries.  But the Fourth Circuit made clear in *Slay's Restoration, LLC v. Wright National Flood Insurance Co.*, 884 F.3d 489 (4th Cir. 2018) that this Court cannot do so.  In that case, a subcontractor that had repaired flood damage in a building claimed that it had been short-changed by the insurance company that paid for the work.  While the insurer undoubtedly played some role in how much the subcontractor was paid, other participants of the repair process had a role in determining how much the subcontractor received:  the owner of the repaired building, the independent claims adjusters who worked for the insurer, and the general contractor hired for the repairs.  The court of appeals determined that it could not simply assume that the other "potential intervening causes" did not act to injure the subcontractor, such that only the insurer could be held responsible for the shortchanging of the subcontractor.  *Id.* at 495.  To the contrary, the Fourth Circuit explained that for a violation of the statute (in that case, RICO) to proximately cause an injury, the injury had to be "sequentially the direct result."  *Id.* at 494.

The Counties' Municipal Services Injuries are anything but "sequentially the direct result" of Defendants' conduct.  Even assuming, as this Court did in its initial motion-to-dismiss decision, that the chain of causation starts with a discriminatory foreclosure, *Montgomery Cty.*, 2019 WL 4805678, at *15, there are still several "intervening roadblocks" independent of Defendants' actions that break the causal chain.  After a foreclosure, there must be a vacancy—and a prolonged

16

vacancy, at that.  *See* Am. Compl. ¶ 415.  During the vacancy, third parties must "vandalize" a foreclosed property, conduct "illegal activities" there, "violate[] . . . building codes," and "dump[] . . . garbage."  Am. Compl. ¶ 416.  It is these independent acts that trigger the "substantial personnel time and out-of-pocket costs," *id.*, not anything that Defendants have done.  Even based on the Counties' own allegations, Defendants' actions are not the proximate cause of the Counties' purported Municipal Services Injuries.

**B.**    **The Counties cannot plausibly establish proximate causation because their purported methodology cannot isolate any Municipal Services Injuries that are directly attributable to Defendants.**

This Court dismissed the Counties' allegations seeking recovery for their Municipal Services Injuries because the Counties "fail[ed] to explain how [the court could] ascertain with any level of detail or precision which expenditures will be attributable to the Banks" because "the entire increase in municipal expenditures over any time period c[ould] not possibly be fairly attributed to the Banks' conduct."  *Montgomery Cty.*, 2019 WL 4805678, at *13 (citation omitted). The Court directed the Counties to provide "plausible methodology by which they might be able to isolate and identify those municipal services costs which are directly attributable to the complained-of practices."  *Id.* at *14; *City of Miami*, 923 F.3d at 1285.  The Counties' Amended Complaint fails to do so, and thus, the allegations seeking recovery for the Municipal Services Injuries should be dismissed with prejudice.

As with their Property Tax Injuries, the Counties' allegations about their Municipal Services Injuries have changed little since the original Complaint—the Amended Complaint still does not allege how the Counties intend to establish the "direct relation" required by *Miami.* Specifically, the Counties fail to allege how much of their damages (1) Defendants are responsible for, or (2) occurred "at the hands of third and fourth parties" (such as "law-breakers") or are otherwise attributable to factors other than a vacancy or foreclosure (such as the age of the home

or dangerous conditions at adjacent properties). *City of Oakland*, 2018 WL 3008538, at \*8.

Despite this Court's clear instructions, the Counties make no suggestion that they will conduct regression-type analyses to remove expenditures that were caused (actually or proximately) by events Defendants had no possible control over, such as the criminal conduct of third parties. Thus, the Counties' proffered statistical analysis will not attempt to exclude things like third party vandalism, "illegal activities," and "garbage" that prompts the provision of municipal services. Am. Compl. ¶ 416. Rather, the Counties claim they can prove their damages by obtaining borrower-specific information which they can cross-reference against their own "regularly maintained databases." Am. Compl. ¶¶ 417-419. That is, they claim they will have isolated "Defendants' discriminatory loans/foreclosures" (Am. Compl. ¶ 390), and then will just "search[]" the address and file for damages for each loan using the Counties' computer systems which "typically"—but evidently not in all cases—"track name and property address information and the timing of recorded events" (Am. Compl. ¶ 419).

This Court has already rejected that approach once, and it should reject it again. The Counties' original Complaint alleged essentially the same thing. *See* Compl. ¶¶ 378-379, 396, 405. This Court made clear that merely asserting that "discovery of Defendants' loan origination, pricing, servicing, and foreclosure data" would "establish their precise and actual damages" as to municipal expenditures is not enough to survive the FHA's proximate cause test. *Montgomery Cty.*, 2019 WL 4805678, at \*14; *Prince George's Cty.*, 397 F. Supp. 3d at 761-62. Rather, to state a claim, the Counties must be able to "isolate" the portion of increased Municipal Services costs "directly attributable to the complained-of practices." *Montgomery Cty.*, 2019 WL 4805678, at \*14; *City of Miami*, 923 F.3d at 1282-86 (rejecting increased expenditure claims because they were not directly attributable to alleged discriminatory lending). Because the Counties cannot remove

18

expenditures proximately caused by "numerous factors"—such as the bad conduct of third parties—their allegations seeking recovery for the Municipal Services Injury must be dismissed with prejudice.

## III.    The Counties' newly created Franchise Tax Injury is the sort of collateral injury for which recovery is barred by the Supreme Court.

The Counties' prior claim that they lost certain municipal incomes, like recording fees, has now been transformed into a very different injury:  that they lost out on franchise taxes from utilities and cable companies.[6]  The Counties claim that, as a result of Defendants' purported discrimination, they have lost "[f]ranchise taxes [] paid . . . when a homeowner uses any of the services that are subject to franchise taxes," including cable and "municipal utilities[] such as water and sewer and services."  Am. Compl. ¶ 405.  They assert that they will be able to prove Defendants proximately caused their respective Franchise Tax Injuries in the same problematic way they seek to prove Municipal Services Injuries, *i.e.*, by simply identifying which properties were affected by Defendants' purported discrimination, and "confirming the amount of any lost utility and franchise tax revenue they would have received over the period the property was vacant."  Am. Compl. ¶ 407.  This novel claim fails for the same reasons this Court previously dismissed the prior "lost income" claims.

### A.    The Amended Complaint fails to establish that the Franchise Tax Injury is caused directly by Defendants' conduct.

Although the Counties have reinvented the nature of this injury, the fatal deficiency remains the same:  the Counties have failed to "flesh out the connection between Defendants'

---

[6] The Counties previously claimed a source of lost municipal income was lost recording fee revenue based on Defendants' use of MERS, *see* Compl. ¶¶ 531-536, but that damages claim is now abandoned and waived.  *See Hardrick v. Canter*, No. 11-cv-3032-DKC, 2012 WL 5409739, at *3 (D. Md. Nov. 5, 2012) (defective claim in original complaint not reproduced in amended complaint is abandoned).

alleged equity stripping practices and the loss of" their franchise taxes. *Montgomery Cty.*, 2019 WL 4805678, at *16. The Counties do not explain how they plan on establishing that *only* Defendants' conduct—and not some other reason, such as a homeowner's preference for streaming services like Netflix, or, more unfortunately, the loss of a job or a reduction in work hours—was the reason that a borrower discontinued utility or cable services at a property. Indeed, the Counties' Franchise Tax Injury argument is not just deficient in proximate cause terms, it is downright implausible in the face of hundreds of recent news articles about consumers "cutting the cord" to cable television and home phone services.

In any event, the Amended Complaint still does not allege, as this Court said it must, "how much, even by rough estimate, the Counties themselves may have suffered" in the form of the Franchise Tax Injury. *Prince George's Cty.*, 397 F. Supp. 3d at 763. Nor does it explain how the Counties "propose to determine and isolate the causal links" between Defendants' conduct and the Franchise Tax Injury, such that there is a "squarely direct relationship" between the two. *Id.* The Counties' proposed method of proving the requisite causal link is to figure out which borrowers were affected by Defendants' discrimination, and somehow checking to see if they would have otherwise received utilities and other services for which franchise taxes are paid. Am. Compl. ¶¶ 404-407. But the Counties do not say how they will do such "checking," leaving it to the Court's imagination whether the Counties' attorneys will, for example, call consumers to inquire about their internet and cable television preferences between 2004 and the present. Of course, even if they did that, it would not establish to any degree of sufficiency that an individual property would have used a franchise-tax-paying utility or service, or which utilities and services would be covered as part of the Counties' analysis. These deficiencies require dismissal of the Franchise Tax Injury.

**B.      The Counties' Franchise Tax Injury is also impermissibly derivative.**

The Franchise Tax Injury also fails because it is impermissibly derivative of harms suffered

20

by others, in contravention of *Miami*'s proximate causation principles.  In the Counties' chain of events, the Counties are not even the first-in-line third parties outside of the borrowers to suffer harm—the utility companies are.  That makes the causal chain even longer than the causal chains for the Municipal Services Injuries.  First, borrowers must subscribe to the cable and utilities services in question.  Second, those borrowers must default on their loans because of Defendants' alleged discrimination, and not some other intervening factor such as job loss or illness.  Third, the affected loans must be foreclosed on, with the borrowers moving out of their properties and discontinuing their use of the utilities' services rather than curing the default.  Fourth, the properties must then remain "vacant for extended periods of time," between the default and the foreclosure, such that "no one [in those properties] is using those services," thus negatively affecting the utilities' bottom-line revenue.  *Id.* ¶¶ 404-405.  Finally, because of the lost income, the utilities pass on less money to the Counties, which collects a percentage of the utilities' aggregate income as franchise taxes.  *Id.* ¶¶ 405-407.

These purported lost franchise taxes are exactly the sort of "ripples of harm [that] flow far beyond the defendant's misconduct" for which the Counties may not recover.  *Bank of Am.*, 137 S. Ct. at 1305-06 (citation and internal quotation marks omitted).  Such "injuries" are inherently derivative injuries on multiple levels—they require harm to the borrower first, then the utilities, then (finally) to the Counties.  As a result, they are unrecoverable (not to mention implausible).

The Supreme Court has made clear that even one level of "derivation" is too much for proximate causation:  a plaintiff cannot recover if "the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'"  *Lexmark*, 572 U.S. at 133 (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268-69 (1992); *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 10–11 (2010)).  Consider the facts of *Holmes*.  There, the Securities Investor Protection

21

Corporation (SIPC) brought suit on behalf of broker-dealers that had gone insolvent as a result of a fraudulent stock-manipulation scheme.  The SIPC claimed that the customers of the broker-dealers were injured by the stock manipulation, especially as many of them did not buy the manipulated securities.  503 U.S. at 271.  The injury eventually flowed to the SIPC, which was forced to cover the funds lost by the broker-dealers as a result of their insolvency.  *Id.*  The Court held that the alleged injury was "too remote" to satisfy proximate cause:  based on the chain of causation, the broker-dealers were harmed first as a result of the stock manipulation, and that harm eventually flowed to the customers.  *Id. Holmes* applied the common-law principle that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover."  *Id.* at 268-70.

The Court later repeated its admonition about third party misfortunes in *Lexmark.*  In that case, the Court held deceptive trademarking practices affected consumers first and foremost—as those "hoodwinked" by deceptive trademarking practices, they had the most direct injury.  572 U.S. at 132.  But because the Lanham Act did not allow "hoodwinked" consumers to bring suit, the Court's proximate cause analysis had to go the next level down, *i.e.*, to the competitors the consumers would have otherwise given their business to—otherwise, no one could bring suit.  *See id.* at 133 ("In a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute.").  Any further derivativeness was too attenuated to be actionable:  the Court noted that while it was plausible that a company's deceptive advertising practices could proximately cause the injuries of a "competitor who is forced out of business," given the "nature of the statutory cause of action," "the same is not true of the

competitor's landlord, its electric company[] and other commercial parties who suffer merely as a result of the competitor's 'inability to meet [its] financial obligations." *Id.* at 133-34 (citation and internal quotation marks omitted).

Much like in *Lexmark*, the Counties' injuries here depend on an injury to a third party—the utility service providers—that can only occur after the first parties (the borrowers) are injured. The utilities themselves suffer only derivative injuries, and the Counties' purported injuries are the derivative of a derivative. If the utilities are like the "electric company, and other commercial parties" in *Lexmark* who could not recover for injuries flowing from a defeated competitor, then the Counties similarly cannot recover. *See Lexmark*, 572 U.S. at 133-34.

IV.     **The Counties' generalized amended allegations are not sufficient to satisfy Rule 8.**

This Court instructed the Counties to allege facts that "show—not just declare" how Defendants proximately caused their Property Tax Injuries, Municipal Services Injuries, and Lost Municipal Income Injuries (now more accurately described as their Franchise Tax Injuries). *Montgomery Cty.*, 2019 WL 4805678, at *14, *16-*17. This Court even allowed the Counties to take the extraordinary step of seeking pre-amendment discovery to substantiate two of their three Injuries.

But the Counties chose not to take any such discovery, and they have not offered this Court any meaningful amendments. Instead, the Counties continue to offer only hypotheticals: if they could get the right discovery, they could identify which properties had been affected by Defendants' purportedly discriminatory actions. Am. Compl. ¶¶ 387-388 (identifying the wish list of loan data discovery), ¶¶ 389-390 (asserting that the Counties' "liability experts" will use "statistical and regression techniques" to "isolate[] discriminatory loans/foreclosures from non-discriminatory loans/foreclosures"). The Counties would then attempt to establish the "direct relation" that *Miami* requires by looking at what would have occurred "but for" the discrimination.

23

For the Property Tax Injury, the suggested future analysis is little more than applying the published tax rate for that year to the experts' recalculated property values.[7] *See* Cowan Decl. ¶ 14.  For the Municipal Services Injury, the suggested analysis is looking up the affected address to see if the Counties provided services there.  Am. Compl. ¶¶ 419-420.  And for the Franchise Tax Injury, the suggested analysis amounts to examining whether the property had used any taxable utilities before foreclosure.  Am. Compl. ¶¶ 407-408.

There are two problems with the Counties' reliance on this type of generalized methodological allegations.  The first is a lack of proximate cause—specifically, directness.  Even if the Counties were able to accurately determine how much they would have received in property and franchise taxes (and how much they would have saved in municipal services) but for Defendants' purported actions, that calculation would shed no light on whether there is "some direct relation" between the injuries and the alleged discrimination.  Using the Counties' methodology, there is no way to tell whether the injuries fall within the first step of damages or the fiftieth.  The Counties have really only alleged that they think their injuries are traceable to Defendants' conduct—and traceability is not good enough.  *See Finkelman v. Nat'l Football League*, 877 F.3d 504, 510 (3d Cir. 2017) (traceability is synonymous with "but for" causation, and exists "even where the conduct in question might not have been a proximate cause of the harm"); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315-16 (4th Cir. 2013) (distinguishing between traceability and the "stringent proximate cause standard," under which the defendant's actions must be the "very last step in the chain of causation" before an injury occurs).

---

[7] As explained above, assessing how much a County would have received from a particular property had the property not been foreclosed on is the wrong way to discern injury, as the Counties would have lost tax revenue from other properties.  In addition, the greater the aggregate value of all properties in a County, the lower the tax rate is—so it would be improper to apply the tax rate actually used for that year.

24

The second problem is one of pleading inadequacy:  the omnibus allegations amount to little more than a promise that, if the Counties are allowed to proceed to discovery, they can fill in all of the proximate cause holes that currently exist in the Amended Complaint.  *See* Am. Compl. ¶ 375 ("Discovery . . . will enable Plaintiffs to prove the linkage . . . ."); *see also* Am. Compl. ¶¶ 387-392.  But the problem with this is that "plaintiffs cannot simply promise the court that once they have completed discovery, something will turn up."  *Midgal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001).  Rule 8 requires more than the promise that discovery will yield the details and substance of a claim; the Counties need more than the "naked assertions" and "unadorned conclusory allegations" that, if they had the right discovery, they would be able to isolate their damages.  *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017) (citation omitted).

## CONCLUSION

Even before Defendants filed their first motion to dismiss, this Court went through a pre-motion conference and gave the Counties the ability to amend their Complaint to address Defendants' arguments for dismissal.  The Counties declined.  This Court then gave the Counties a second chance to amend after the Court's dismissal order and provided detailed instruction as to what had to be pleaded.  Yet the Counties still have not stated recoverable claims for their Property Tax (Am. Compl. ¶¶ 9, 379-384, 391-403), Municipal Services (¶¶ 9, 380, 415-420), and Franchise Tax (¶¶ 380, 404-408) Injuries.  There is no reason to think they could rectify the continued deficiencies with a third opportunity to amend.  These injuries should be dismissed with prejudice. *Turner v. JPMorgan Chase, N.A.*, No. 14-cv-0576, 2015 WL 5021390, at \*6 (D. Md. Aug. 21, 2015).

Dated: January 17, 2020                    Respectfully submitted,

                                           /s/ Thomas M. Hefferon
                                           Thomas M. Hefferon (No. 15109)
                                           Sabrina Rose Smith (No. 17738)
                                           Matthew S. Sheldon (admitted *pro hac vice*)
                                           Andrew Kim (admitted *pro hac vice*)
                                           GOODWIN PROCTER LLP
                                           1900 N Street, N.W.
                                           Washington, D.C. 20036
                                           Tel.:  202.346.4000
                                           Fax.:  202.346.4444
                                           *THefferon@goodwinlaw.com*
                                           *SRoseSmith@goodwinlaw.com*
                                           *MSheldon@goodwinlaw.com*
                                           *AndrewKim@goodwinlaw.com*

                                           *Counsel for Defendants*

26